Sanjay S. Schmidt (SBN 247475)
LAW OFFICE OF SANJAY S. SCHMIDT
1388 Sutter Street, Suite 810
San Francisco, CA 94109
T: (415) 563-8583
F: (415) 223-9717
ss@sanjayschmidtlaw.com

Grace Jun (SBN 287973)
501 West Broadway, Suite 1480
San Diego, CA 92101
T: (310) 709-4012
grace@gracejunlaw.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

ELIZABETH ANN LAUREL, Decedent, by and through her successors in interest; A.L., a minor, by and through his proposed guardian ad litem, Maria Laurel, individually and as co-successor in interest to Decedent; and R.R., a minor, by and through her proposed guardian ad litem, Maria Laurel, individually and as co-successor in interest to Decedent,

        Plaintiffs,

    vs.

COUNTY OF ALAMEDA, a municipal corporation; WELLPATH, LLC; CALIFORNIA FORENSIC MEDICAL GROUP (CFMG), a California corporation; ASAAD TRAINA, M.D.; ADIAM HAILE, R.N.; SHELBY MOORE, R.N.; HOMAYUN SALEH, P.A.; LAILA KARIM, R.N.; K. BROWN, R.N.; and DOES 1-30, individually, jointly and severally,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No.: 3:24-cv-04427-RFL**

**FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL**

1

Plaintiffs, by and through their attorneys, the LAW OFFICE OF SANJAY S. SCHMIDT and GRACE JUN, ESQ., for their Complaint against Defendants, state as follows:

## INTRODUCTION

This 42 U.S.C. § 1983 civil-rights, wrongful-death, and survival action arises out of Defendants' deliberate indifference to the serious, emergent medical needs of ELIZABETH ANN LAUREL, a forty-year-old mother of two, who was enduring opiate withdrawal and aspirated and died as a result of the deliberate indifference of Defendant WELLPATH, LLC's, medical staff in failing to appropriately manage and treat her acute withdrawal symptoms – including the failure to transfer her to a hospital – and the deliberate indifference of the COUNTY's correctional staff in failing to properly monitor her welfare, resulting in her death, on February 13, 2023, at the COUNTY OF ALAMEDA's Santa Rita Jail. LAUREL's death was one of seven in-custody deaths, in 2023, and as of February 10, 2024, the Santa Rita Jail had seen nearly 70 in-custody deaths in the preceding 10 years, with four of those occurring in the first few weeks of 2023 alone. This First Amended Complaint is being filed pursuant to the stipulation of the parties, ECF No. 51, per Federal Rule of Civil Procedure 15(a)(2). *Id*.

## JURISDICTION

1. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343(a)(3) and (4), and the above-mentioned statutory and constitutional provisions. Plaintiffs further invoke the supplemental jurisdiction of this Court, pursuant to 28 U.S.C. § 1367(a), to hear and decide claims arising under state law.

2. A substantial part of the events and/or omissions complained of herein occurred in the City of Dublin, in Alameda County, California. Pursuant to Civil Local Rule 3-2(d), this action is properly assigned to the San Francisco Division or the Oakland Division of the United States District Court for the Northern District of California, and has been assigned to the San Francisco Division.

//

2

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

**PARTIES AND PROCEDURE**

3.    Minor Plaintiff A.L. is and was at all times herein mentioned the son of Decedent ELIZABETH ANN LAUREL ("LAUREL") and is a resident of the State of California. He is represented in this matter by his maternal grandmother and guardian ad litem, Maria Laurel. Minor Plaintiff A.L. brings these claims individually for wrongful death, Cal. Code Civ. Proc. §§ 377.60 *et seq.*, and as co-successor in interest for his mother, Decedent LAUREL, pursuant to California Code of Civil Procedure §§ 377.11 and 377.20 *et seq.*, and for violation of his personal rights. *See also* ECF No. 45-2 and Order at ECF No. 47.

4.    Minor Plaintiff R.R. is and was at all times herein mentioned the daughter of Decedent ELIZABETH ANN LAUREL ("LAUREL") and is a resident of the State of California. She is represented in this matter by her maternal grandmother and guardian ad litem, Maria Laurel. Minor Plaintiff R.R. brings these claims individually for wrongful death, Cal. Code Civ. Proc. §§ 377.60 *et seq.*, and as co-successor in interest for her mother, Decedent LAUREL, pursuant to California Code of Civil Procedure §§ 377.11 and 377.20 *et seq.*, and for violation of her personal rights. See also ECF No. 46-2 and Order at ECF No. 48.

5.    Defendant COUNTY OF ALAMEDA ("COUNTY") is a public entity, duly organized and existing under the laws of the State of California. Defendant COUNTY, under its authority, operates the Santa Rita Jail and is and was responsible for ensuring the provision of adequate medical services to all Santa Rita Jail inmates. Defendant COUNTY is responsible for ensuring that the basic human needs of individuals in its custody are met, and for ensuring that inmates are not at risk of serious harm, including by providing appropriate funding, oversight, and corrective action to ensure adequate conditions of confinement, including adequate medical care. Defendant COUNTY is also responsible for ensuring that jail policies and practices do not violate inmates' constitutional rights or put them at risk of serious harm. Defendant COUNTY, by law, possesses the ultimate authority over and legal responsibility for the medical care, withdrawal treatment, and physical safekeeping of all incarcerated persons at the Santa Rita Jail, including Decedent ELIZABETH ANN LAUREL. Defendant COUNTY sits in loco parentis to its inmates and has

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

ultimate responsibility for the inmates' wellbeing. Defendant COUNTY also operates and manages the Alameda County Sheriff's Office ("ACSO"). Defendant COUNTY is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the ACSO and their employees and/or agents, as well as those of all other COUNTY employees and agents. Pursuant to California Government Code § 815.2, the COUNTY is vicariously liable for the state-law torts of its employees and agents, including the individually named and/or to-be-identified Defendants herein.

6.    Sheriff Yesenia Sanchez ("SANCHEZ") was, at all material times, the Sheriff-Coroner of Defendant COUNTY. As Sheriff-Coroner, SANCHEZ was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control of all ACSO custodial employees and/or agents. SANCHEZ, with the assistance of a small group of executive officers, is and was charged by law with the administration of the Santa Rita Jail. SANCHEZ also is and was responsible for the promulgation of policies and procedures and allowance of the practices/customs, pursuant to which certain acts of the ACSO alleged herein were committed for the COUNTY, and at all material times, she was acting within the course and scope of that employment. Further, SANCHEZ was ultimately responsible for the provision of medical care to inmates at the Santa Rita Jail, and all COUNTY and WELLPATH policies, procedures, and training related thereto. For events relevant to this case, on information and belief SANCHEZ was the final policymaker of Defendant COUNTY.

7.    Defendant WELLPATH, LLC ("WELLPATH") is a Delaware corporation headquartered in Nashville, Tennessee. Defendant WELLPATH, one of the nation's largest for-profit correctional health-care providers, services about 394 county jails and community facilities, and more than 140 state and federal prisons in about 36 states. The COUNTY has contracted with Defendant WELLPATH and its precursor, Co-Defendant California Forensic Medical Group ("CFMG"), to provide medical care, including detoxification treatment, for Santa Rita Jail inmates since 2016.[1]

---

[1] WELLPATH was created in 2018 from HIG Capital's merging CFMG with another correctional-healthcare company, Correct Care Solutions. COUNTY contracts with CFMG for the provision of

4

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

8.    Defendant CALIFORNIA FORENSIC MEDICAL GROUP ("CFMG") is an active, domestic, for-profit corporation incorporated in the State of California with its principal place of business in San Diego, California. Defendant CFMG at all relevant times contracted and still contracts with the COUNTY to provide comprehensive medical services that are defined in the contract, and include, but are not limited to, general medical, dental, prenatal, and opioid treatment services at Santa Rita Jail. On information and belief, CFMG is akin to an alter ego of WELLPATH; as such, for purposes of this complaint, WELLPATH and CFMG are used interchangeably. As such, all allegations in this First Amended Complaint that only directly refer to either WELLPATH or CFMG should be regarded as also being allegations against the other. Additionally, individual WELLPATH employee Defendants may, on information and belief, also be de-facto CFMG employees; as such, all allegations relating to individual WELLPATH employees, including, but not limited to, allegations pertaining to their acts and omissions occurring within the course and scope of their employment by WELLPATH, should be regarded as also indicating that such acts and omissions occurred within the course and scope of their employment of CFMG, if and to the extent it is later revealed or determined they are actual or de-facto employees of CFMG, too.

9.    On information and belief, WELLPATH, CFMG, and their employee and medical directors for WELLPATH's / CFMG's services at the Santa Rita Jail were at all material times responsible for making and enforcing policies, procedures, supervision, and training related to the medical care of inmates at Defendant COUNTY's Santa Rita Jail, including, but not limited to: providing appropriate alcohol and drug detoxification and withdrawal care; referring inmates with serious medical needs to be seen immediately by medical doctors; transferring the care of inmate patients to either the jail infirmary or an inpatient facility, including if there are no doctors on-site that can immediately treat a patient and ensure they receive appropriate care for acute conditions, such as acute withdrawals; refusing jail admission for inmates before they have received necessary

medical services in the Santa Rita Jail. CFMG is owned by HIG Capital as part of its portfolio of correctional-medical group companies. In 2015, the *Sacramento Bee* reported that, over a 10-year period, jails contracting with CFMG had a rate of suicide and drug overdoses 50 percent higher than in non-CFMG serviced county jails in California. *See* https://www.sacbee.com/news/investigations/the-public-eye/article7249637.html.

5

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

medical clearance and care from a hospital; assessing inmates for emergency medical needs; and sending inmates for emergency medical care.

10. On information and belief, WELLPATH, CFMG, and their employees and agents are and were at all material times responsible for making and executing policies, procedures, supervision, and training related to the medical care of inmates at the Santa Rita Jail, including, but not limited to: properly assessing and classifying inmates; properly referring inmates for emergency medical care; properly sending inmates for medical clearance before admission to the jail; properly providing appropriate detoxification to manage withdrawals; properly providing an individual treatment plan for each inmate / pretrial detainee; providing appropriate alcohol and drug detoxification and withdrawal care; referring inmates with serious medical needs to be seen immediately by medical doctors; transferring the care of inmate patients to either the infirmary or an inpatient facility, including if there are no doctors on-site that can immediately treat a patient and ensure they receive appropriate care for acute conditions, such as acute withdrawals; refusing jail admission for inmates before they have received necessary medical clearance and care from a hospital; assessing inmates for emergency medical needs; and sending inmates for emergency medical care.

11. Certain individually named WELLPATH employees, including Defendants ASAAD TRAINA, M.D., ADIAM HAILE, R.N., SHELBY MOORE, R.N., HOMAYUN SALEH, P.A., LAILA KARIM, R.N., and K. BROWN, R.N, as well as to-be-identified DOE Defendants, all of whom were employees and agents acting within the course and scope of their employment with WELLPATH (and within the course and scope of their employment with COUNTY by virtue of WELLPATH's contract with COUNTY), were all responsible for properly sending inmates for emergency medical care and/or obtaining appropriate medical clearance from a qualified medical professional before admitting them to the jail; properly assessing and addressing the medical needs of inmates; properly referring inmates that require a higher level of care than an RN can provide within the scope of their practice and licensure to medical doctors; providing appropriate alcohol and drug detoxification and withdrawal treatment; properly assessing and treating the serious

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

medical needs of inmates; providing appropriate individual treatment plans; and providing appropriate observation and monitoring of inmates with acute conditions.

12. Defendant ASAAD TRAINA, M.D. ("TRAINA"), was, at all relevant times mentioned herein, a physician licensed to practice medicine in the State of California, a supervisor of other WELLPATH Defendants, including Defendant ADIAM HAILE, R.N., and employee of Defendant WELLPATH, working as a medical doctor at or for Defendant COUNTY's Santa Rita Jail, responsible for overseeing and providing medical care to inmates, and acting within the course and scope of that employment. On information and belief, Defendant TRAINA was ultimately responsible for WELLPATH's provision of medical care to inmates at the Santa Rita Jail, including the Decedent, and including ensuring that R.N.s were properly assessing and classifying inmates; properly referring inmates for emergency medical care; properly sending inmates for medical clearance before admission to the jail; properly providing appropriate detoxification and monitoring to manage withdrawals and related symptoms; properly providing an individual treatment plan for each inmate; providing appropriate alcohol and drug detoxification and withdrawal care; referring inmates with serious medical needs to be seen immediately by medical doctors; transferring the care of inmate patients to either the infirmary or an inpatient facility, if there are no doctors on-site that can immediately treat a patient and ensure they receive appropriate care for acute conditions, such as acute withdrawals; transferring inmates to the jail infirmary; refusing jail admission for inmates before they have received necessary medical clearance and care from a hospital; assessing inmates for emergency medical needs; sending inmates for emergency medical care; instituting appropriate treatment plans for the serious medical needs of patients; communicating about a patient's medical needs with custodial staff, health-care professionals, and outside facilities; and Defendant TRAINA was responsible for all WELLPATH policies, procedures, and training related thereto.

13. Defendant ADIAM HAILE, R.N. ("HAILE"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. As set forth below, Defendant HAILE failed to provide appropriate detoxification

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

and withdrawal care; provided incompetent detoxification care; failed to properly monitor LAUREL's symptoms by regular assessments; and, failed to inform any physician about LAUREL's deteriorating and serious medical condition and serious medical needs, despite LAUREL's obvious medical emergency, requiring immediate transfer to a hospital for inpatient treatment and supervision, with deliberate indifference to LAUREL's serious medical needs.

14. Defendant SHELBY MOORE, R.N. ("MOORE"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. As set forth below, Defendant MOORE failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to properly monitor LAUREL's symptoms by regular assessments; and, failed to inform any physician about LAUREL's deteriorating and serious medical condition and serious medical needs, despite LAUREL's obvious medical emergency, requiring immediate transfer to a hospital for inpatient treatment and supervision, with deliberate indifference to LAUREL's serious medical needs.

15. Defendant HOMAYUN SALEH, P.A. ("SALEH"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. As set forth below, Defendant SALEH failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to properly monitor LAUREL's symptoms by regular assessments; and, failed to inform any physician about LAUREL's deteriorating and serious medical condition and serious medical needs, despite LAUREL's obvious medical emergency, requiring immediate transfer to a hospital for inpatient treatment and supervision, with deliberate indifference to LAUREL's serious medical needs.

16. Defendant LAILA KARIM, R.N. ("KARIM"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. As set forth below, Defendant KARIM failed to provide appropriate detoxification and withdrawal care; provided incompetent detoxification care; failed to properly monitor LAUREL's symptoms by regular assessments; and, failed to inform any physician about LAUREL's deteriorating and serious medical condition and serious medical needs, despite

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

LAUREL's obvious medical emergency, requiring immediate transfer to a hospital for inpatient treatment and supervision, with deliberate indifference to LAUREL's serious medical needs.

17. Defendant K. BROWN, R.N. ("BROWN"), was at all material times employed by Defendant WELLPATH, and acted at all material times within the course and scope of that employment. Defendant BROWN performed the initial medical screening on LAUREL when she was booked, and despite indications that LAUREL was still acutely intoxicated, failed to properly medically clear LAUREL, failed to recommend that she be placed in a sobering cell, failed to obtain medical clearance from a medical doctor before admitting her to the Santa Rita Jail; and, failed to inform any physician about LAUREL's serious medical condition and serious medical needs, despite LAUREL's obvious medical emergency, requiring immediate transfer to either a hospital or the Santa Rita Jail infirmary for inpatient detoxification and close monitoring, with deliberate indifference to LAUREL's serious medical needs.

18. Despite Plaintiffs' counsel's multiple requests for records under the California Public Records Act and via other means, Defendants, including the Alameda County Sheriff's Department, have not provided Plaintiffs' counsel with all unredacted documents, existing body-worn camera videos, jail surveillance video, reports, jail records, and other information concerning this incident. In fact, Plaintiffs also served a subpoena on the Alameda County Sheriff's Department, in response to which its counsel refused to produce any documents. Plaintiffs are, therefore, ignorant of the true names and capacities of Defendants DOES 1–30, and, thus, sue these Defendants by such fictitious names. Plaintiffs are informed and believe, and thereon allege, that each Defendant so named is responsible in some manner for the injuries and damages sustained by Plaintiffs as set forth herein. Plaintiffs will amend their Complaint to state the names and capacities of each DOE Defendant, when they have been ascertained.

19. Plaintiffs are further informed and believe, and thereon allege, that each of the Defendants herein gave consent, aid, and assistance to each of the remaining Defendants, and ratified and/or authorized the acts or omissions of each Defendant as alleged herein, except as may be hereinafter otherwise, specifically alleged.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

20.  At all material times, each Defendant was jointly engaged in tortious activity and was an integral participant in the events and violations of rights described herein, resulting in the deprivation of Decedent's and Plaintiffs' constitutional rights and other harm.

21.  The acts and omissions of Defendants were at all material times pursuant to the actual customs, policies, practices, and procedure of the COUNTY and WELLPATH (including CFMG), as set forth herein.

22.  At all material times, each Defendant acted under color of the laws, statutes, ordinances, and regulations of the State of California.

23.  Plaintiffs timely and properly filed a government code claim, pursuant to California Government Code § 910 *et seq.*, and this action is timely filed within all applicable statutes of limitation.

24.  This First Amended Complaint may be pleaded in the alternative, pursuant to Rule 8(d)(2) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

25.  Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

### I.  ELIZABETH ANN LAUREL'S INTAKE AT THE SANTA RITA JAIL INDICATED SHE HAD SERIOUS AND EMERGENT MEDICAL NEEDS.

26.  On February 11, 2023, ELIZABETH ANN LAUREL was arrested for possession of fentanyl and methamphetamine. She arrived at and was booked into the Santa Rita Jail that afternoon, on February 11, 2023.

27.  During intake, LAUREL related to the ACSO classification officer that she was homeless, and was withdrawing from heroin, fentanyl, benzodiazepines, and alcohol. Accordingly, the Santa Rita Jail classification unit made a referral to WELLPATH; the referral form indicated that LAUREL presented "signs of acute withdrawal (kicking)", LAUREL reported a history of substance abuse, and LAUREL reported a "current concern for withdrawal (kicking)".

28.  Fentanyl is a very strong opioid. It is profoundly addictive and illicit use is common

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

because it is much cheaper than heroin, and easier to obtain.

29. At the time of her intake, LAUREL was under the influence of drugs and/or alcohol and was noted to have a history of an addiction to both drugs and alcohol.

30. LAUREL asked an ACSO to be seen by medical staff due to "benzo and opiate" withdrawal.

31. Some substances are known to cause predictable illness when use is suddenly stopped. Predictable illness caused by stopping use of a substance is clinically known as withdrawal. Chronic opioid use is a common reason for newly incarcerated individuals to develop a withdrawal syndrome. A commonly used monitoring tool for opioid withdrawal is known as the COWs score. CIWA is a similar monitoring tool for patients who are withdrawing from alcohol.

32. Opioid Use Disorder ("OUD") is the clinical name for opioid addiction.

33. WELLPATH personnel conducted a urinalysis as part of the prescreening process, and LAUREL's result was positive for fentanyl, methamphetamine, amphetamine, and ecstasy/MDMA. WELLPATH F.N.P. Deborah Massetti was notified of these urinalysis results.

34. On February 11, 2023, at 10:16 p.m., WELLPATH Defendant K. BROWN, R.N., noted the following with respect to LAUREL: "Altered health maintenance d/t mental health issues, substance abuse, homelessness, At risk for ineffective oxygenation d/t Asthma At risk for dehydration, tremor/seizure/DT, malnutrition, liver damage and BHI crisis d/t alcohol abuse/withdraw At risk for dehydration, insomnia, malnutrition, BHI crisis d/t opiate abuse and withdraw At risk for BHI crisis, malnutrition d/t crystal meth abuse and withdraw …" Although LAUREL reported suffering from asthma and using albuterol (an inhaler), BROWN failed to obtain an initial "peak flow measurement," which is a baseline value obtained to monitor airway circulation among asthmatics. BROWN further failed to order an inhaler for LAUREL or refer LAUREL for assessment by a medical provider.

35. During her WELLPATH screening, on February 11, 2023, LAUREL reported consuming ~ 1/5 of a gallon (750 ml) per day for the past seven years, having last consumed alcohol that day. She reported experiencing tremors from prior withdrawals.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

36. LAUREL also reported that she was withdrawing from opiates (synthetics) and methamphetamine; she reported using both daily for the past seven years. She reported experiencing chills, inter alia, during prior withdrawal.

37. Even though it was apparent that LAUREL was both **acutely intoxicated and actively withdrawing**, Defendant BROWN gave the recommendation that LAUREL be housed in General Population ("GP"), instead of in the jail infirmary or an inpatient facility, where LAUREL could receive the high level of medical care for active withdrawal that she required. An individual can be withdrawing from drugs or alcohol while intoxicated. Defendant BROWN did indicate that LAUREL needed an "Emergent (Today)" medical referral, however, that LAUREL required an "Urgent (Tomorrow)" referral to the MAT/OTP Coordinator, and that LAUREL required an "Urgent (Tomorrow)" referral to the Discharge Planner. The medical treatment order for the housing of LAUREL in General Population was also given or approved of by WELLPATH F.N.P. Deborah Massetti.

38. WELLPATH NP Deborah Massetti[2] prescribed the following medications for LAUREL: folic acid; multivitamins; thiamine (vitamin B-1); diazepam (valium), a benzodiazepine; loperamide (Imodium); acetaminophen; and meclizine (for nausea). Contrary to accepted standards within addiction medicine, Massetti did not prescribe any medications for treatment of opioid use disorder (OUD) or opioid withdrawal.

39. According to the Department of Justice's Guidelines for Managing Substance Withdrawal in Jails, "[e]ffective management of opioid withdrawal involves initiation of long-term buprenorphine or methadone. When administered in a timely manner, these medications prevent withdrawal *and* treat OUD . . . . Opioid withdrawal management without ongoing pharmacotherapy does not treat the underlying OUD and leaves the patient at risk for overdose and death."[3] Although LAUREL admitted to a long history of abusing opioids, was acutely

---

[2] NP Massetti may be named as a Defendant in a future, amended complaint, if the facts uncovered in discovery indicate liability on her part.

[3] *Guidelines for Managing Substance Withdrawal in Jails*, United States Department of Justice Bureau of Justice Assistance, June 2023, at p. 2, available at: https://www.cossup.org/Content/Documents/JailResources/Guidelines_for_Managing_Substance

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

intoxicated on fentanyl, and further advised Defendants of her risk of withdrawal, Defendants never provided LAUREL with buprenorphine or methadone, with deliberate indifference

40.  Defendant BROWN performed the initial medical screening on LAUREL when she was booked, and despite indications that LAUREL was still acutely intoxicated, failed to properly medically clear LAUREL, failed to recommend that she be placed in a sobering cell, failed to obtain medical clearance from a medical doctor before admitting her to the Santa Rita Jail; and, failed to inform any physician about LAUREL's serious medical condition and serious medical needs, despite LAUREL's obvious medical emergency, requiring immediate transfer to either a hospital or the Santa Rita Jail infirmary for inpatient detoxification and close monitoring, thereby placing LAUREL at substantial risk of suffering serious harm.

41.  Defendant DOES include Alameda County Sheriff's Office deputies, including the classification deputies, who knew that LAUREL was acutely intoxicated and actively withdrawing based on her direct report to classification officers. Moreover, LAUREL had a history of suffering from alcohol and drug withdrawal and intoxication based on previous jail records. Despite this knowledge, these to-be-identified COUNTY DOES and other DOES placed LAUREL in general population instead of a sobering cell or jail infirmary. Based on information and belief, to-be-identified DOE Defendants failed to place any alerts or flags on LAUREL's file indicating she was a medically fragile inmate, who required additional monitoring.

42.  Because LAUREL indicated she was both intoxicated and withdrawing from opiates and alcohol, BROWN performed a COWS and CIWA-Ar screening of LAUREL. COWS and CIWA-Ar are scoring scales that provide a numerical score to reflect the severity of withdrawal from opioids (COWS) or alcohol (CIWA-Ar). These scoring scales consist of a series of questions regarding the symptoms of the individual suffering from withdrawal with a numerical score calculated based on the individual's responses and symptom presentation. At 10:57 p.m., on February 11, 2023, BROWN performed the COWS and CIWA-Ar screening tests. LAUREL had a blood pressure of 110/74, a pulse of 102, and a temperature of 97.7. BROWN calculated a COWS

_Withdrawal_in_Jails.pdf

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

score of 6 and a CIWA-Ar score of 6 for LAUREL at 10:57 p.m., on 2/11/2023.

43. At 6:06 a.m., on 2/12/2023, Defendant Nurse HAILE purportedly conducted a COWS and CIWA-Ar assessment of LAUREL. HAILE, however, left both scores blank. LAUREL reported feeling "freezing" to Defendant HAILE. Chills are a known symptom of opioid withdrawal. Paradoxically, on the COWS scoring sheet, HAILE also wrote that LAUREL had no reports of chills.

44. At 10:00 a.m., on 2/12/2023, WELLPATH Nurse Brooks purportedly conducted a COWS and CIWA-Ar assessment of LAUREL. Brooks noted LAUREL's blood pressure had jumped to 136/83 and her pulse remained high at 100. Brooks documented a CIWA-Ar score of 1 and a COWS score of 5 for LAUREL. LAUREL reported "chills and stomach pain with the urge to vomit[.]" Despite LAUREL's report of chills, Brooks then paradoxically documented that LAUREL had no report of chills.

45. At 7:09 p.m., on 2/12/2023, Defendant KARIM was responsible for obtaining a COWS and CIWA-Ar score for LAUREL. KARIM left both scores "blank." According to KARIM, LAUREL refused vital signs and KARIM instructed LAUREL to drink fluids and stay hydrated.

46. At 3:14 a.m., on 2/13/2023, Defendant HAILE saw LAUREL again. HAILE noted that LAUREL was "seen earlier than scheduled time due to **mandown for n/v** (nausea/vomiting)." (emphasis added.) "Mandown for n/v" indicated a deputy had seen LAUREL down on the floor in severe distress and had called for emergency medical assistance. LAUREL told HAILE, "I don't feel good" and reported she felt "freezing" and was suffering from chills and stomach cramps. LAUREL said she had vomited 5 times in the last 24 hours with the last bout of vomiting occurring in the past 10 minutes. Puzzlingly, LAUREL had seen HAILE in the past 24 hours, but HAILE had previously noted that LAUREL had not vomited. HAILE noted there was dried vomit on the floor of LAUREL's cell. LAUREL again reiterated to HAILE that she was addicted to alcohol. HAILE instructed LAUREL to "stay well hydrated as tolerated." HAILE obtained two pulse rates for LAUREL, which were measured after LAUREL was sitting or lying down for one minute. One pulse was 101 and the second was 120. HAILE recorded an additional pulse rate of 112. Despite

14

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

seeing dried vomit on the floor of LAUREL's jail cell and LAUREL's racing pulse, and despite having responded to a "mandown" call, HAILE only calculated a CIWA-Ar score of 3 and a COWS score of 7.

47. According to HAILE's note, HAILE administered Zofran, an anti-nausea medication, to LAUREL at this time. But there was no active medication order for Zofran at this time. There is no indication HAILE obtained a doctor's order for Zofran and no indication that HAILE ever referred LAUREL to be seen by a doctor for a medication order.

**II.    LAUREL'S CONDITION SEVERELY DETERIORATED ON THE MORNING OF FEBRUARY 13, 2023, BUT WITH DELIBERATE INDIFFERENCE TO HER SERIOUS MEDICAL NEEDS, THE WELLPATH DEFENDANTS ALL FAILED THROUGHOUT THE DAY TO PROPERLY NOTIFY A MEDICAL PRACTITIONER AND, CONSEQUENTLY, LAUREL WAS NEVER PROPERLY ASSESSED AND HER CARE WAS NOT PROPERLY TRANSFERRED TO AN INPATIENT PROVIDER, THUS RESULTING IN HER NEEDLESS DEATH.**

48. At 9:44 a.m., on 2/13/2023, LAUREL was assessed by Defendant Nurse MOORE. LAUREL's temperature was 100.4, meaning she had a fever. MOORE documented LAUREL had an elevated respiratory rate of 26 breaths per minute. LAUREL had "visible gooseflesh" and reported that she had chills and felt dizzy. MOORE noted LAUREL was "actively throwing up while nurse present." MOORE provided LAUREL with a CIWA-Ar score of 10 and a COWS score of 11. MOORE did not provide LAUREL with IV fluids for hydration. She did not refer LAUREL to a doctor or seek a transfer of LAUREL to the infirmary, where she could be more closely monitored. MOORE did not offer LAUREL any additional liquids or assistance. MOORE did nothing.

49. LAUREL began to clinically deteriorate to an alarming degree, with both COWs and CIWA scores trending upwards. She was vomiting heavily by February 13, 2023, causing her to become dangerously and acutely dehydrated. The autopsy conducted on LAUREL after her death showed that LAUREL's lungs were congested and filled with fluid. There was "gastric like material within the trachea and primary bronchi." An examination of LAUREL's lungs showed "vascular congestion and aspirated gastric materials within the peripheral airway." In other words,

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

LAUREL had vomited severely for a prolonged period, causing her to inhale her stomach contents, or aspirate. LAUREL's air passages became clogged with her stomach contents, impeding her ability to move air in and out of her lungs and exchange carbon dioxide for oxygen as normally would happen. Low oxygenation, which is clinically referred to as hypoxia, eventually will lead to cardiac rhythm interruption and death. The autopsy further found that LAUREL did not have any urine in her bladder, meaning she was severely dehydrated.

50. Human cells are mostly made up of water. Whether by excess loss of water through sweating, vomiting, diarrhea, bleeding and so forth, or by reduced intake, a deficit of body water is clinically referred to as dehydration. Severe dehydration requires intravenous fluid administration. Severe dehydration, if not treated, will result in death.

51. Neither aspiration nor dehydration are spontaneous events, meaning LAUREL had been vomiting for a long time and showing objective signs of decline and sickness. Based on information and belief, Defendant DOES, ACSO deputies responsible for conducting safety checks every hour (or more frequently, if needed) of LAUREL on February 13, 2023, should have seen LAUREL in distress. These to-be-identified DOES, however, failed to timely summon medical care for LAUREL and failed to alert any medical provider that LAUREL needed immediate care.

52. At approximately 7:02 p.m., on 2/13/2023, nurses at the jail responded to a call for emergency assistance by ACSO deputies. ACSO deputies were performing chest compressions on LAUREL. LAUREL's eyes were open, her pupils were fixed, dilated, and nonreactive, and her skin was pale and cold to touch. LAUREL never regained a pulse. There was no cardiac rhythm. Paramedics declared LAUREL dead at 7:42 pm.

53. LAUREL's presentation at 7:02 p.m. as cold to touch with fixed and dilated pupils, and her inability to regain a pulse despite extensive interventions, indicated LAUREL had been deceased for a while. Based on information and belief, the to-be-identified Defendant DOES, ACSO deputies, should have noticed LAUREL was unconscious and nonresponsive during their bi-hourly – or more frequent, if needed – safety checks and responded sooner.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

54. According to a medical note in LAUREL's records, LAUREL was purportedly seen at 5:20 p.m., on 2/13/2023, by Defendant nurse KARIM. According to KARIM's note, LAUREL refused the CIWA-Ar and COWS monitoring check at this time. KARIM did not document how LAUREL appeared or whether she continued to suffer from nausea or vomiting. KARIM did not follow up on any of the worrying symptoms noted in MOORE's earlier report. KARIM did not refer LAUREL to a medical provider for further assessment. Moreover, KARIM's note regarding this interaction with LAUREL was noticeably entered at 1:00 a.m. on 2/14/2023 – almost six hours after LAUREL's death.

55. Although the Coroner noted the cause of LAUREL's death to be "acute polydrug toxicity (fentanyl, methamphetamine)", a more precise finding can be gleaned from the autopsy – LAUREL died of complications of opioid withdrawal due to vomiting, aspiration from vomiting, and dehydration.

56. LAUREL aspirated because she vomited and she vomited because she was in opiate withdrawal; she was in opioid withdrawal because she was an incarcerated chronic opioid user, who no longer had access to opioids, and the above-named WELLPATH Defendants failed to properly treat and monitor her opiate use disorder, with deliberate indifference to her serious medical needs.

57. If LAUREL had been sent either to a local hospital or to the Santa Rita Jail infirmary (and had been appropriately assessed and treated there), she would not have died on the evening of February 13, 2023.

58. On information and belief, Defendant TRAINA was notified in the morning of LAUREL's heavy vomiting, but with deliberate indifference to her serious medical needs, and putting LAUREL at substantial risk of suffering serious harm, Defendant TRAINA failed to assess LAUREL and failed to transfer LAUREL to a hospital or to the Santa Rita Jail's infirmary.

59. Defendant HAILE was aware of the fact that LAUREL was heavily vomiting on the morning of February 13, 2023; instead of immediately referring LAUREL for assessment and treatment by a physician, and with deliberate indifference to LAUREL's serious medical needs,

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

and putting LAUREL at substantial risk of suffering serious harm, on information and belief, Defendant HAILE obtained Zofran (nausea medication) without an appropriate approval and order from an active medical practitioner and administered it to LAUREL.

60. Defendant HAILE, on information and belief, did not properly or adequately consult with a medical practitioner to provide a clinical status update regarding LAUREL's vomiting. LAUREL was, thus, with deliberate indifference to her serious medical needs, and in putting her at substantial risk of suffering serious harm, denied an assessment by a medical practitioner and was, thus, denied an opportunity for needed medical intervention, including, but not limited to, a transfer to a local hospital or to the facility's infirmary for additional care.

61. Defendant MOORE was deliberately indifferent to the Decedent's serious medical needs because, inter alia, she had an encounter with LAUREL on February 13, 2023, at approximately 9:44 a.m., and documented LAUREL to be "actively throwing up" with an elevated respiratory rate of 26 breaths/minute (with the normal rate being 12-20) and a temperature of 100.4 F, which is a fever. These circumstances absolutely required the attention of a medical practitioner, so that prompt medical care could be provided to the Decedent. An elevated respiratory rate and fever are also consistent with acute aspiration, which is what was confirmed in the course of the autopsy of Decedent. The failure by Defendant MOORE to notify a healthcare practitioner of the Decedent's precipitous deterioration evidenced a deliberate indifference to LAUREL's serious medical needs because, as a result of MOORE's failures, the Decedent was not properly assessed by a qualified healthcare practitioner, and her care was not transferred to either the Santa Rita Jail infirmary or a local hospital, thus resulting in her death.

62. Defendant SALEH saw the Decedent later, on February 13, 2023, at approximately 4:12 p.m., as her condition had progressively worsened. Yet, Defendant SALEH failed to follow-up on the acute and highly dangerous clinical observations and findings by MOORE from approximately 9:44 a.m. Defendant SALEH had a duty to assess and document the status of LAUREL's respiratory rate and temperature and had a duty to provide a clinical update regarding LAUREL to a qualified medical practitioner. Yet, none of these duties were performed by Defendant SALEH.

18

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

These failures by Defendant SALEH evidenced a deliberate indifference to LAUREL's serious medical needs because, as a result of SALEH's failures, the Decedent was still – as of the afternoon of February 13, 2023, when she was still alive – not properly assessed by a qualified healthcare practitioner, and her care was not transferred to either the Santa Rita Jail infirmary or a local hospital, thus resulting in her death.

63. Similarly, Defendant KARIM saw the Decedent on February 13, 2023, at approximately 5:20 p.m., as her condition had worsened even more than when Defendant SALEH had seen her. Yet, Defendant KARIM failed to follow-up on the acute and highly dangerous clinical observations and findings by MOORE from approximately 9:44 a.m. Defendant KARIM also had an independent duty to assess and document the status of LAUREL's respiratory rate and temperature and had a duty to provide a clinical update regarding LAUREL to a qualified medical practitioner. Yet, none of these duties were performed by Defendant KARIM. These failures by Defendant KARIM evidenced a deliberate indifference to LAUREL's serious medical needs and put her at substantial risk of suffering serious harm because, as a result of KARIM's failures, the Decedent was still – as of the early evening of February 13, 2023, when she was still alive – not properly assessed by a qualified healthcare practitioner, and her care was not transferred to either the Santa Rita Jail infirmary or a local hospital, thus resulting in her death

## III. THE TO-BE-IDENTIFIED COUNTY OF ALAMEDA DOE DEFENDANTS, ACSO DEPUTIES, FAILED TO CONDUCT ADEQUATE GENERAL OBSERVATION LOG CHECKS ON LAUREL.

64. Appropriate correctional practices require direct *visual* safety checks of every inmate in appropriate intervals to ensure their safety and welfare. A passing glance is not a proper direct visual safety check; rather, a proper direct visual safety check requires that an officer get close enough to see each inmate and look long enough to determine if the inmate is breathing and not in medical distress or involved in any prohibited behaviors.

65. Section 1027 of Title 15 of the California Code of Regulations requires sufficient personnel "to ensure implementation and operation of the programs and activities required by these regulations." This means that there must be enough staff to ensure compliance with this legal

19

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

obligation, and inadequate staffing to comply with this requirement would place pretrial detainees and inmates that are in the custody of the COUNTY and ACSO at substantial risk of suffering serious harm.

66. On the day that LAUREL died and in the time preceding her needless, in-custody death, LAUREL's condition had precipitously worsened – as explained above – and, thus, she was at substantial risk of suffering serious harm.

67. By virtue of being house in general population, in a cell, instead of being in the Santa Rita Jail infirmary or a local hospital, the Decedent was on a flat bunkbed, was not being given an IV, and was not being closely monitored by medical personnel. As such, she was at substantial risk of suffering serious harm.

68. On information and belief, the COUNTY's to-be-identified ACSO staff that was on duty in the housing unit where LAUREL had been placed knew or had reason to know of her acute medical condition and the fact that she was at substantial risk of suffering serious harm due to her condition, as described above.

69. Yet, the to-be-identified COUNTY employees' checks on LAUREL were inadequate to ensure the safety and continuing wellbeing of LAUREL, who was suffering from acute and emergent medical conditions as a result of opiate withdrawals. Defendant COUNTY has a policy requiring safety checks once every half-hour, but ACSO staff, on information and belief, failed to follow this policy, and failed to conduct appropriate and sufficiently thorough checks of LAUREL. As noted above, Defendant COUNTY's policy concerning the performance of "safety checks" is perfunctory and does not include direct visual observation that is sufficient to assess the inmate's well-being – or lack thereof – and behavior. Defendant COUNTY's policy of "safety checks" fails to use verbal interaction as a part of the "safety checks", even when visual observation of the inmate is obscured, or circumstances otherwise demonstrate a reason for concern about the inmate's well-being and behavior. As a result, inmates, including inmates suffering from acute opiate withdrawals, like LAUREL, are put at a substantial risk of suffering serious harm; that is precisely what occurred in this case, on information and belief.

70. Defendant COUNTY has also failed to provide enough Sheriff's Technicians in the

20

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

Housing Control Points, a critical post for observing inmates like LAUREL, to ensure their safety. On information and belief, and at all relevant times, there is and was only a single Sheriff's Technician assigned to each Housing Unit Control Point, and not having sufficient staff in each Housing Control Point created an unreasonable risk of harm to the Decedent, and placed the Decedent at substantial risk of suffering serious harm.

**IV.　THE SANTA RITA JAIL HAS A DISTURBINGLY HIGH RATE OF IN-CUSTODY DEATHS AND COUNTY POLICYMAKERS WERE ON NOTICE PRIOR TO DECEDENT'S DEATH THAT UNCONSTITUTIONAL CONDITIONS EXISTED IN THE SANTA RITA JAIL, INCLUDING INADEQUATE TREATMENT AND MONITORING OF INMATES AT RISK OF SUFFERING SERIOUS HARM DUE TO OPIATE WITHDRAWAL.**

71. When the COUNTY OF ALAMEDA takes custody of a person, the officials in charge of the custody and medical services at the Santa Rita Jail have a responsibility to ensure the person's health and safety.

72. Yet, between 2014 and January 2022, 57 people died at the COUNTY's Santa Rita Jail.[4] Santa Rita Jail has a 50-percent higher death rate than the Los Angeles County Jail, which is six times its size.[5]

73. The Santa Rita Jail has the highest number of in-custody deaths in the Bay Area and has an even higher jail death rate than Los Angeles County, which has the largest jail system in the country.[6]

74. Recently, a large portion of the in-custody deaths at the Santa Rita Jail are a result of medical inattention, such as inadequate withdrawal treatment and drug overdose.[7]

75. Drug and alcohol intoxication and withdrawal are frequent and recurring medical conditions among detainees at jails, and are conditions that the Alameda County Sheriff's Office

---

[4] Lisa Fernandez, *Ist in-custody death of 2022 occurs at Santa Rita Jail* (Jan. 6, 2022), available at: https://www.ktvu.com/news/1st-in-custody-death-of-2022-occurs-at-santa-rita-jail

[5] Lisa Fernandez, *Death rate at Santa Rita exceeds nation's largest jail system as critics call for reform* (Oct. 1, 2019), available at: https://www.ktvu.com/news/death-rate-at-santa-rita-exceeds-nations-largest-jail-system-as-critics-call-for-reform

[6] Lisa Fernandez, *A look at the people who have died at Santa Rita Jail* (Dec. 13, 2023), available at: https://www.ktvu.com/news/a-look-at-the-people-who-have-died-at-santa-rita-jail

[7] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

routinely encounters.

    a.    "At the time of arrest and detention, it has been estimated that 70 to 80 percent of all inmates in local jails and State and Federal prisons had regular drug use or had committed a drug offense, and 34 to 52 percent of these inmates were intoxicated at the time of their arresting offense."[8]

    b.    "Drug or alcohol intoxication has accounted for an increasing share of deaths in local jails over time.  It accounted for 15% of all deaths in 2019, after suicide and heart disease (25%).  The rate of intoxication deaths more than quadrupled, from 6 per 100,000 in 2000 to 26 per 100,000 in 2019."[9]

    c.    For the period of 2000 to 2019, women detained at local jails "died of drug or alcohol intoxication at an average annual rate (20 per 100,000) that was nearly double that of male inmates (11 per 100,000)."[10]

76. "Sixty-three percent of individuals sentenced to jail (compared to 5 percent of adults in the general population) meet the diagnostic criterial for SUD (substance use disorder)."[11] Although, suicide is technically the leading single cause of death in jails, "individuals with opioid use disorder have a threefold higher risk for suicidal behavior than those without opioid use disorder."[12]

77. Because many individuals arrive at the jail acutely intoxicated, treatment of acute intoxication and medically supervised withdrawal must occur in tandem. The standards of the National Commission on Correctional Health Care (NCCHC), a national accrediting agency for

---

[8] Center for Substance Abuse Treatment, 2006, Detoxification and Substance Abuse Treatment, Treatment Improvement Protocol (TIP) Series, No. 45, HHS Publication No. (SMA) 15-4131, Rockville, MD: Substance Abuse and Mental Health Services Administration, retrieved November 1, 2023 from https://store.samhsa.gov/sites/default/files/d7/priv/sma15- 4131.pdf ("TIP 45"), at p. 118.

[9] E. Ann Carson, 2021, "Mortality in Local Jails, 2000-2019 - Statistical Tables," Bureau of Justice Statistics Statistical Tables, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, retrieved December 17, 2021 from https://bjs.ojp.gov/content/pub/pdf/mlj0019st.pdf, at p. 3.

[10] *Id*. at p.4

[11] *Guidelines for Managing Substance Withdrawal in Jails*, *supra*., at p. 2.

[12] *Id*.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

correctional health care, state detainees showing signs of either acute intoxication or withdrawal must be regularly monitored by qualified health care professionals and medically supervised withdrawal must be managed by a physician. The NCCHC further requires that inmates "experiencing severe or progressive intoxication (overdose)" or severe alcohol or drug withdrawal be transferred immediately to a licensed acute care facility.

78. As evidenced by the following instances of Santa Rita jail deaths, the Defendant COUNTY OF ALAMEDA has a custom and practice of denying adequate medical care to detainees who are acutely intoxicated and/or withdrawing from drugs or alcohol, and failing to transfer these seriously ill individuals to acute care hospitals, ultimately resulting in the following deaths:

    a.    On March 14, 2014, Robert D. Moore, Jr., died of acute polydrug toxicity. Mr. Moore had a history of drug abuse and had been living in a half-way house. He was found unresponsive in a jail cell.

    b.    On April 22, 2024, Edward Laron Wilhite died due to acute cocaine toxicity. An ACSO deputy observed Wilhite exhibiting symptoms of withdrawal. He was found unresponsive in his jail cell. Wilhite died two days after his arrest.

    c.    On October 24, 2014, Roscil Rodgers died in the custody of the ACSO. His lungs were congested and he was observed to have needle tracks on his arm.

    d.    On December 6, 2014, Eric Steven Bueno died of suicide by hanging after three days in the jail. He had methamphetamine in his system.

    e.    On December 10, 2014, Lawrence James Monroe, age 28, died of "chronic alcoholism" after one day in custody. Mr. Monroe was observed intoxicated. Deputies found him nonresponsive in his jail cell.

    f.    On March 30, 2015, John Anthony Cornejo, age 20, died of acute methamphetamine intoxication one day after he was booked into jail. He was observed to be sweating and appeared to be having a seizure.

    g.    On February 11, 2017, Christina Angelina Lamendola died of acute methamphetamine intoxication at the jail. She collapsed and passed away after

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

complaining of shortness of breath.

h.    On October 26, 2017, Miguel Gomez died of suicide by hanging. Another inmate reported that Gomez had been using drug and had not exited his cell. He was found hanging from his bed sheets.

i.    On October 30, 2017, Mark Anthony Laventure, Jr., died of acute drug intoxication on his second day in jail. Methadone, methamphetamine, and amphetamine were found in his system.

j.    On July 6, 2019, Christopher Dean Thomas died of suicide by hanging. He had a history of drug problems and methamphetamine and marijuana in his system.

k.    On October 6, 2019, Ray Porter died of complications from substance abuse and carcinoma.

l.    On October 24, 2019, Johnnie Leonard died after "snorting a substance" in jail.

m.    On February 26, 2020, Jonah Andrews, age 25, died of acute fluoxetine toxicity after he snorted a white powdery substance and then vomited excessively on the date of his death.

n.    On February 9, 2021, as a result of various COUNTY and WELLPATH Defendants' deliberate indifference to the serious, emergent medical and mental-health needs of Jonas Alexander Park, a thirty-three-year-old, who had a history of anxiety and bi-polar disorder, and who endured Fentanyl withdrawal and prolonged isolation without appropriate supervision, he died in his cell by suicide, at the COUNTY's Santa Rita Jail. Mr. Park's death was the seventeenth suicide (at that time) at the Santa Rita Jail since 2014. This action is still pending. *See* ECF No. 98 in *K.C., et al. v. County of Alameda, et al.*, Case No. 4:22-cv-01817-DMR.

o.    On April 2, 2021, Vinetta Martin committed suicide. A logbook regarding cell checks indicated that a deputy had been conducting 30-minute safety checks on Ms. Martin. But a subsequent review of video footage showed that the deputy had not made those checks. Deputies had failed to conduct checks on Ms. Martin every 30-minutes as required

24

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

by policy.

p.      On May 16, 2021, Lee Esther Anderson died of fentanyl intoxication.

q.      On November 15, 2021, Maurice Monk died at the Santa Rita jail. Mr. Monk suffered from a number of medical conditions and had been prescribed a variety of medications that jail staff failed to provide him. For the final three days of his life, jail deputies and medical staff observed Mr. Monk lying face down on his bunk, covered in feces and surrounded in a pool of urine. Unopened meals, water, and medication littered his floor. Although deputies were required to conduct checks on Mr. Monk every 30-minutes, video surveillance demonstrated staff were foregoing timely welfare checks. One deputy told Internal Affairs investigators that "it was normal for deputies to miss several wellness checks and simply fill them in later to suggest deputies had conducted the checks." Mr. Monk was dead for three days before deputies and medical staff finally entered Mr. Monk's cell to discover he was stiff and not breathing. He had lain in the same position for so long that Mr. Monk had bed sores on his legs and the ink of his red t-shirt stained his mattress. In November 2024, the Alameda County District Attorney's office charged deputies and a Wellpath nurse with elder/dependent adult abuse. Three of the deputies were further charged with one felony count of falsifying documents.

r.      On January 6, 2022, Marcos Garibay died. He was seen suffering from symptoms of opioid / fentanyl intoxication before he died.

s.      On June 7, 2022, Jose Cardenas Pina died due to complications of alcohol withdrawal. Fentanyl was also found in his system.

t.      On January 17, 2023, Stephen Lofton died of suicide after struggling with substance abuse.

u.      On February 4, 2023, Charles Johnson II died of meningitis and pneumonia with multiple drugs found in his system, including amphetamine and cocaine.

v.      On February 28, 2023, Candice Vanburen died of anoxic encephalopathy due to acute fentanyl intoxication the day after she was booked into jail. Ms. Vanburen alerted

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

medical staff during the intake/screening process that she was using drugs.

79.    Defendant COUNTY was well-aware of deficiencies in medical care that WELLPATH and/or CFMG failed to provide to detainees, leading to the deaths described in the foregoing paragraph and subparagraphs. After an in-custody death, WELLPATH must conduct an "Administrative Mortality Review," which assesses correctional and emergency responses surrounding the death and is conducted in conjunction with custody staff, and a "Clinical Mortality Review," which examines the clinical care provided and the circumstances leading up to a death. According to WELLPATH's policy related to Alameda County, there is a section of the Mortality and Morbidity Report and Review referred to as "Part III" (also called "Form 01c Report and Recommendations") that is referenced in both the administrative and the clinical reviews. As part of the Clinical Mortality Review, the responsible health authority or health services administrator (RHA), a WELLPATH employee, completes a draft Part III and submits it to the Wellpath Corporate Office. As part of the Administrative Mortality Review, the RHA then holds a meeting with Wellpath employees and a representative of Wellpath's client (in this case, Defendant COUNTY), to review the "areas on Form 01c Report and Recommendations and any other relevant factors to the specific event." Thus, Defendant COUNTY and Defendant WELLPATH knew or should have known, and in any event, had reason to know, of systemic deficiencies in the lack of care provided to inmates suffering from intoxication and/or withdrawal resulting in death.

80.    As of February 10, 2024, "in the last 10 years, the Santa Rita jail has seen almost 70 deaths, with 4 of those occurring in the first few weeks of 2023 alone."[13] In response to this, Harold Orr, the former clinical director at the Santa Rita Jail, observed: "All circumstances surrounding this unfortunate situation need to be thoroughly investigated to determine why another inmate has succumbed while being held in our County Jail[.]"[14] "Calls for investigations and oversight have

---

[13] Vanguard Administrator, *Another Day – Another Death at Santa Rita Jail* (Feb. 10, 2024), available at: https://www.davisvanguard.org/2024/02/another-day-another-death-at-santa-rita-jail/
[14] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

been ringing from advocates, community organizations and residents for years. In fact, just this October[,] pastors, rabbis and faith leaders gathered to demand action now on the intake process at Santa Rita jail."[15]

81. Commenting on what was then a recent in-custody death at the beginning of 2024, Jennifer Esteen, a psychiatric nurse, observed: "We need to look into the protocols for jail medical staff immediately. For someone to have died so quickly indicates problems in the intake process, medical screening and with the regularity of visual and physical assessments[.]"[16]

82. On information and belief, by custom and policy, neither Defendant WELLPATH's (including CFMG's) staff, nor Defendant COUNTY's ACSO staff, are adequately trained to recognize signs and symptoms of acute intoxication or withdrawal.

83. Defendant COUNTY has failed to ensure that the care of inmates, such as the Decedent in this case, is transferred to a higher-level provider, such as a medical doctor and, where necessary, to the infirmary or an inpatient facility, in a timely manner. On information and belief, there has been no policy in place to ensure that ACSO and Defendant WELLPATH staff refer inmates to a higher-level provider and, where necessary, to the infirmary or an inpatient facility.

84. In fact, Defendant WELLPATH (including CFMG) and Defendant COUNTY maintain a constitutionally deficient policy regarding transfer to a hospital for inmates who are acutely intoxicated or suffering from severe symptoms of withdrawal. ACSO staff and WELLPATH personnel fail to make appropriate referrals to higher-level providers and fail to timely transfer inmates to the infirmary or to an inpatient facility and, consequently, inmates who exhibit symptoms of acute drug or alcohol withdrawal are not timely treated. Defendants WELLPATH and COUNTY knew they maintained a constitutionally inadequate policy for hospital transfers based on the following:

   a.    On June 26, 2018, in the class action matter of *Jaclyn Mohrbacher et al. v. Alameda County Sheriff's Office et al.*, Case No. 18-cv-00050-JD, plaintiffs alleged in a Third

[15] *Id*.
[16] *Id*.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

Amended Complaint that Alameda County was impermissibly incentivizing and encouraging WELLPATH to refuse emergency medical services and inpatient hospitalization to inmates held at Alameda County jails by forcing WELLPATH to pay for all hospitalization costs. Even when WELLPATH was able to recoup the costs of such hospitalization or emergency services from a third-party, such as an insurer, WELLPATH is required to relinquish such reimbursement to the Alameda County Sheriff's Office. By requiring WELLPATH to pay for all hospitalization costs and limiting WELLPATH's ability to recover the costs of such care, the ACSO "creates a financial incentive and imperative for CFMG to refuse and withhold needed and appropriate outside medical services to all inmates," including inpatient hospitalization. *See* Third Amended Complaint, Case No. 18-cv-00050-JD, ECF No. 103, ¶¶ 56-64.

b.      In September 2018, in the case of *Candace Steel and Baby H v. the Alameda County Sheriff's Office et al.*, Case No. 3:18-cv-05072-JD, plaintiffs alleged Santa Rita jail personnel failed to send Ms. Steel to the hospital, even though she began to feel cramping and pain and she was 8-months pregnant. Ms. Steel, who suffered from a number of issues, including a history of seizures and drug and alcohol abuse, was placed locked in a dirty isolation cell and forced to deliver her baby without any medical assistance. Ms. Steel alleged that the ACSO's contract with WELLPATH required WELLPATH to pay for any care provided to inmates at a hospital by third-party medical personnel. WELLPATH must pay for all inpatient hospitalization services, regardless of the level of cost incurred. "By requiring CFMG to pay for any and all medical care provided out of SRJ (Santa Rita Jail) to any SRJ inmate, and by limiting CFMG's ability to recover any amount CFMG pays for such care, ACSO's contract with CFMG creates a financial incentive and imperative for CFMG to refuse and withhold inpatient hospitalization services to all inmates, including inmates in active labor." ECF No. 10, First Amended Complaint in Case No. 18-cv-05072-JD.

85. Defendant COUNTY knew that WELLPATH personnel were denying hospitalization and

28

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

emergency medical services to inmates because it was forcing WELLPATH, a for-profit corporation, to bear the costs of such services alone. Yet, it took no steps to revise or amend its policy regarding hospital care for seriously ill inmates, such as Elizabeth LAUREL, and took no steps to incentivize WELLPATH personnel to ensure hospital transfers were initiated for critically ill inmates. At the time of LAUREL's death, Defendant COUNTY maintained the same inadequate policy and practice alleged in the *Mohrbacher* class action and *Candace Steel* case that are referenced above.

86. Defendant COUNTY fails to identify, treat, track, and supervise inmates who are at risk for serious harm due to acute opiate withdrawal.

87. Defendant COUNTY's and WELLPATH's policies and practices for screening, supervising, and treating prisoners at substantial risk for suffering serious harm due to acute opiate withdrawal are inadequate. Individuals suffering from opioid use disorder, like LAUREL, must be provided buprenorphine or methadone to prevent withdrawal and treat the disorder. Without pharmaceutical intervention, individuals suffering from OUD are at risk of death.

88. As evidenced in the deaths of inmates described in ¶ 78, *supra*, Defendant COUNTY has a custom of not adequately training ACSO staff to identify inmates who are at risk of serious complications from intoxication or withdrawal and to respond appropriately to inmates who are exhibiting signs of experiencing medical problems, putting them at substantial risk of suffering serious harm. This is especially problematic because ACSO staff, both during the intake process and for the duration of an inmate's time at the Santa Rita Jail, are primarily responsible for alerting medical staff when an inmate requires immediate medical attention. DOJ guidelines state that custody staff must be able to identify emerging signs and symptoms of withdrawal in individuals who initially screen negative, particularly in the first 72 hours after intake because some individuals may not be forthright about intoxication and their risk of withdrawal. Because custody have not been properly trained, the individuals described in ¶ 78, as well as Elizabeth Laurel, needlessly died in custody due to intoxication and withdrawal.

89. Defendant COUNTY's policy for conducting welfare checks, also referred to as "General

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

Observation Log" ("GOL") checks, is also inadequate to ensure the safety and continuing wellbeing of inmates that are suffering from opiate withdrawals. Defendant COUNTY has a policy requiring safety checks once every half-hour, but ACSO staff fail to follow this policy, and frequently fail to conduct appropriate and sufficiently thorough checks at intermittent and unpredictable times. Defendant COUNTY's policy concerning the performance of "safety checks" is perfunctory and does not include direct visual observation that is sufficient to assess the inmate's well-being – or lack thereof – and behavior. Defendant COUNTY's policy of "safety checks" fails to use verbal interaction as a part of the "safety checks", even when visual observation of the inmate is obscured, or circumstances otherwise demonstrate a reason for concern about the inmate's well-being and behavior. As a result, inmates, including inmates suffering from acute opiate withdrawals, are put at a substantial risk of suffering serious harm. As occurred in the deaths of Vinetta Martin, Maurice Monk, and other in-custody deaths that occurred in the COUNTY's Santa Rita jail, deputies will falsify logbooks to make it appear that checks are occurring every 30 minutes while video surveillance shows the checks are not timely.

90. Defendant COUNTY has also failed to provide enough Sheriff's Technicians in the Housing Control Points, a critical post for observing inmates to ensure their safety. On information and belief, and at all relevant times, there is and was only a single Sheriff's Technician assigned to each Housing Unit Control Point, and not having sufficient staff in each Housing Control Point creates an unreasonable risk of harm to inmates.

91. Defendant COUNTY, at the time of LAUREL's incarceration and in-custody death and at present, has knowledge of the substantial risk of harm caused by inadequate opiate withdrawal treatment policies and practices in the Santa Rita Jail, but has failed to take steps to prevent, or even to diminish, the harmful effects of these unlawful policies and practices. Defendant COUNTY is, thus, deliberately indifferent to the risk of harm to inmates created by the COUNTY's failure to operate a constitutionally adequate opiate withdrawal treatment program in its jail.

92. Furthermore, if COUNTY is unable to provide constitutionally adequate opiate withdrawal

30
FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

treatment in its jail, it must enact and execute policies that dictate that inmates, such as the Decedent in this case, be transferred out of the Santa Rita Jail to an inpatient facility, where they will be appropriately treated and monitored.

93. Defendants COUNTY, WELLPATH, to-be-identified supervisors and policymakers for the COUNTY AND WELLPATH, and DOES 1-30 knew before ELIZABETH ANN LAUREL's death that many preventable, in-custody deaths from constitutionally deficient opiate withdrawal management had occurred prior to that date, which were caused by the COUNTY's and WELLPATH's customs and practices of not providing sufficient opiate withdrawal treatment; not providing a constitutionally adequate opiate withdrawal treatment program; failing to require that R.N.'s consult with and refer patients to be seen by a physician or mid-level provider for deteriorating and serious medical conditions that require immediate transfer to a hospital for inpatient treatment and supervision; improperly addressing the opiate-detoxification needs of inmates; and failing to properly monitor inmates, especially those at risk of suffering serious harm as a result of opiate-withdrawal related complications.

94. In 2016, on information and belief, an American Correctional Association ("ACA") audit of the Santa Rita Jail referenced a lack of timely security checks. On information and belief, Defendant COUNTY and SANCHEZ have a custom and practice of leaving Sheriff's Deputy and Sheriff's Technician positions vacant, so there are not enough deputies or Sheriff's Technicians to conduct appropriate safety checks on inmates.

95. Relatedly, and as evidence of the COUNTY's, WELLPATH's, and CFMG's actual or constructive knowledge of the need for appropriate policies, training, and customs, as are alleged to be missing or deficient in this complaint, including, but not limited to, the custom or practice of failing to ensure timely and adequate GOL checks are performed, Defendants COUNTY, WELLPATH, and CFMG knew or had reason to know at the time of LAUREL's incarceration in the COUNTY's jail as a pretrial detainee, which culminated in her death, that there had also been at least seventeen in-custody deaths between 2014–2019, which were caused by the COUNTY's and WELLPATH's customs and practices of putting mental-health inmates in restrictive housing,

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

and not providing sufficient mental-health diagnosis or treatment; not providing a constitutionally adequate suicide-prevention and treatment program; improperly addressing the opiate-detoxification needs of inmates; and failing to properly monitor inmates with timely and adequate welfare checks:

a. On February 10, 2014, Yanet Diaz, a Santa Rita inmate housed alone in restrictive housing, classified as a "mental-health inmate," suffered an anoxic brain injury and later died after she committed suicide by strangulation using a telephone cord while in a holding cell – which is overseen by the COUNTY's ACSO, and for which the ACSO is responsible – at the Alameda County Superior Court in Fremont.[17]

b. On March 6, 2014, Kevin Mark Hurd, housed alone in restrictive housing as an administrative-segregation inmate, died three days after his booking into the Jail, after he committed suicide by hanging from a noose made out of his Jail bedsheet.[18]

c. On June 3, 2014, Duoc Van Chau, housed alone in restrictive housing as a mental-health, administrative-segregation inmate, died after he committed suicide by hanging in a holding cell using a County-issued T-shirt.[19]

d. On December 6, 2014, Eric Steven Bueno, housed alone in restrictive housing, died three days after his booking into the Jail, after he committed suicide by hanging using his bed sheets; he was found to have had methamphetamine in his system.[20]

e. On March 3, 2015, Gary Clee Oldham, housed alone for 24-hours a day, with no out-of-cell time, died after he committed suicide by hanging using a bedsheet on February 21, 2015.[21]

f. On February 8, 2015, Michael Anthony Brown, an administrative segregation

---

[17] Lisa Fernandez, *A look at the 45 inmates who have died at Santa Rita Jail in the last five years*, ktvu.com (Oct. 4, 2019; updated Nov. 18, 2020), https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

inmate housed alone in restrictive housing, committed suicide by hanging/asphyxiation from his upper bunk. He had covered his cell window with cardboard.[22]

g.    On June 19, 2015, Christopher Luis Daniel Angulo, a mental-health inmate housed alone in restrictive housing, committed suicide by slitting his right arm and hemorrhaging to death.[23]

h.    On December 10, 2015, John Jeffrey Bonardi, a protective-custody inmate housed alone in restrictive housing, died of suicide by hanging/asphyxiation, after using the top bunk and a ligature to commit suicide.

i.    On July 15, 2016, Balvir Singh, a mental-health inmate housed alone in restrictive housing,  committed suicide by hanging/asphyxiation, using a bed sheet, while his cell mate was out of the cell on pod time, and, thus, he (Singh) was alone.[24]

j.    On October 30, 2016, Barry Heisner Jr., housed alone in restrictive housing, committed suicide by hanging/asphyxiation.[25]

k.    On October 26, 2017, Miguel Gomez, housed alone in Housing Unite 23, committed suicide by hanging/asphyxiation by using his bedsheet as a ligature device, after other inmates had told correctional deputies that Gomez was suicidal.[26]

l.    On November 29, 2017, Edwin Alexander Villalta, housed alone in a cell and classified as an administrative segregation inmate, committed suicide by hanging/asphyxiation from the upper bunk.[27]

m.    On April 8, 2018, Logan McKinley Masterson, who suffered from substance-abuse and mental-health issues and was classified as an administrative segregation inmate and

---

[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] Lisa Fernandez, *A look at the 45 inmates who have died at Santa Rita Jail in the last five years*, ktvu.com (Oct. 4, 2019; updated Nov. 18, 2020), https://www.ktvu.com/news/a-look-at-the-45-inmates-who-have-died-at-santa-rita-jail-in-the-last-five-years.
[27] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

put on restrictive housing, committed suicide by hanging himself with a bed sheet.[28] The incident resulted in a lawsuit by Masterson's heirs against the COUNTY, AHERN, and WELLPATH's predecessor corporation, CFMG, *Masterson, et al. v. County of Alameda, et al.*, No. 4:19-cv-1625-PJH (N.D. Cal.), which resolved in April of 2021.

n.      On June 10, 2019, twenty-year-old Christian Madrigal committed suicide by hanging himself in an isolation cell using chains the Deputies left in the cell.[29] His stepfather and mother brought a wrongful-death, § 1983 civil-rights lawsuit against Defendant COUNTY, *Jaime, et al. v. County of Alameda, et al.*, No. 3:19-cv-08367-SI (N.D. Cal.), which was resolved, in October 2020.

o.      On July 6, 2019, Christopher Dean Thomas, who had a history of drug problems and was housed alone, died by anoxic encephalopathy and hanging, having been found suspended with a noose fashioned from a bedsheet around his neck.[30]

p.      On or about July 24, 2019, Raymond Christopher Reyes, Jr., who had a history of drug problems and mental-health issues, spent 19 days in isolation before he died by hanging.[31] Mr. Reyes's parents and minor child sued Defendants COUNTY and WELLPATH, *Reyes, et al. v. County of Alameda, et al.*, No. 4:20-cv-03971-DMR (N.D. Cal.), which suit was later resolved.

q.      On December 4, 2019, Christopher Crosby, who was on suicide watch, committed suicide by asphyxiation with a plastic bag.[32] His mother and his minor child sued Defendants COUNTY and WELLPATH, *Crosby, et al., v. County of Alameda, et al.*, No. 3:20-cv-08529-MMC (N.D. Cal).

96.  In April 2021, *prior* to the in-custody death of ELIZABETH ANN LAUREL, as cited in a report by the Alameda County Civil Grand Jury (2021-2022 Alameda County Civil Grand Jury Final Report), "the U.S. Department of Justice provided the Alameda County Board of Supervisors

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

with notice of "…*Conditions that we have reasonable cause to believe* **violate the Constitution and federal law**… *After carefully reviewing the evidence, we conclude that there is reasonable cause to believe that Alameda County and the Alameda County Sheriff's Office… engage in a* **pattern or practice of constitutional violations in the conditions at the Santa Rita** *Jail.*[33] (emphasis added).

97.  On April 22, 2021, at the conclusion of a multi-year study, the Civil Rights Division of the U.S. Department of Justice provided formal notice to Defendant COUNTY OF ALAMEDA, by and through its Sheriff at the time, of the "alleged conditions that we have reasonable cause to believe violate the Constitution and federal law and the supporting facts giving rise to those violations."[34]

98.  Prior to the in-custody death of ELIZABETH ANN LAUREL, the Alameda County Civil Grand Jury issued a report, on June 6, 2022, concerning health and safety violations at the Santa Rita Jail, inter alia.

99.  In its 2021-2022 report, the Grand Jury found that: "delayed access to care and challenges with ensuring continuity of medication were recurring themes"; "demand for medical services exceeded available capacity, often causing long wait times for appointments"; the Grand Jury "found examples of incomplete and inaccurate information in medical records as well as operational procedures that interfered with care delivery"; and "reported quality levels were far below established standards".[35]

## V.    LAUREL'S DEATH WAS THE RESULT OF THE COUNTY AND WELLPATH DEFENDANTS' DELIBERATE INDIFFERENCE TO HER SERIOUS MEDICAL NEEDS AND WELLBEING.

100.     LAUREL's death was the proximate result of the COUNTY, WELLPATH, and

---

[33] 2021-2022 Alameda County Civil Grand Jury Final Report, at p. 78 (emphasis added); available at: https://grandjury.wpengine.com/wp-content/uploads/2022/12/Grand.Jury_.Report.2022.for_.ITD_.Web_.pdf

[34] United States Department of Justice, *Notice Regarding Investigation of Alameda County, John George Psychiatric Hospital, and Santa Rita Jail* (Apr. 22, 2021), https://www.justice.gov/crt/case-document/file/1388891/download

[35] *Id*. at 84-85.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

CFMG Defendants' deliberate indifference to her serious medical needs and wellbeing, as well as the failure to protect her, as set forth above.

101.    LAUREL's death was also the proximate result of Defendant COUNTY's failure to reasonably train and supervise the jail deputies tasked with screening, admitting, observing, monitoring, and protecting LAUREL. These substantial failures reflect Defendant COUNTY's policies of implicitly or directly ratifying and/or authorizing the deliberate indifference to serious medical needs and the failure to reasonably train, instruct, monitor, supervise, investigate, and discipline deputies employed by Defendant COUNTY, with deliberate indifference to inmates' serious medical needs, and subjecting pretrial detainees like LAUREL to conditions of confinement that put LAUREL and others at substantial risk of suffering serious harm. These failures persisted, despite the availability of measures to abate or reduce the risk of putting LAUREL and others at substantial risk of suffering serious harm.

102.    LAUREL's death was also the proximate result of the WELLPATH Defendants' failure to reasonably staff, train, supervise, and equip their medical staff in the proper and reasonable screening, assessment, and care of inmates needing emergency medical treatment, emergency withdrawal treatment, and treatment for detoxification from drugs, including Fentanyl and opiates.

103.    At all material times, and alternatively, the actions and omissions of each and every Defendant were intentional, wanton, and/or willful, conscience-shocking, reckless, malicious, deliberately indifferent to Decedent's and Plaintiffs' rights, grossly negligent, and/or objectively unreasonable.

104.    As a direct and proximate result of each Defendant's acts and/or omissions as set forth above, to the extent permitted and pleaded by the various legal claims set forth below, Plaintiffs sustained the following injuries and damages, past and future, among others:

    a.    Wrongful death of ELIZABETH ANN LAUREL, pursuant to California Code of Civil Procedure § 377.60, *et seq.*;

    b.    Loss of support and familial relationships, including loss of love, companionship,

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

comfort, affection, society, services, solace, and moral support, pursuant to California Code of Civil Procedure § 377.60 *et seq.*;

 c. ELIZABETH ANN LAUREL's hospital and medical expenses, pursuant to California Code of Civil Procedure § 377.20 *et seq.*;

 d. ELIZABETH ANN LAUREL's coroner's fees and funeral and burial expenses, pursuant to California Code of Civil Procedure § 377.20 *et seq.*;

 e. Violation of ELIZABETH ANN LAUREL's constitutional rights, pursuant to California Code of Civil Procedure § 377.20 *et seq.* and federal civil rights law;

 f. ELIZABETH ANN LAUREL's pre-death pain, suffering, or disfigurement, pursuant to state law (Cal. Code Civ. Proc. § 377.34);

 g. ELIZABETH ANN LAUREL's loss of life, pursuant to federal civil rights law;

 h. ELIZABETH ANN LAUREL's conscious pain and suffering, pursuant to federal civil rights law; and,

 i. All damages and penalties recoverable under 42 U.S.C. §§ 1983 and 1988, and as otherwise allowed under California and United States statutes, codes, and common law.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(42 U.S.C. § 1983 14th Am.—Deliberate Indifference to Serious Medical Needs and Failure to Protect Pretrial Detainee)**
**PLAINTIFFS AGAINST DEFENDANTS TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, and DOES 1-30**

105. Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

106. By the actions and omissions described above, Defendants, including the individually named Defendants and the to-be-identified COUNTY, WELLPATH, and CFMG DOE Defendants, deprived ELIZABETH ANN LAUREL, through Plaintiffs, of the following clearly established and well-settled constitutional rights that are protected by the Fourteenth Amendment to the United States Constitution:

37
FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

a.      ELIZABETH ANN LAUREL's right to needed medical care while in custody;

b.      ELIZABETH ANN LAUREL's right to be protected while in custody.

107.     Serious deterioration of a patient suffering from withdrawals can happen in a jail like the COUNTY's Santa Rita Jail. When circumstances occur like those that existed with regard to LAUREL, prompt notification of a healthcare practitioner, such as a physician, physician's assistant, or advanced practice registered nurse is required, so that the patient's condition can be assessed, and an appropriate treatment plan can be put in place. As a result of the deliberate indifference of Defendants TRAINA, HAILE, MOORE, SALEH, KARIM, and BROWN, which put LAUREL at substantial risk of suffering serious harm, the proper notification was not made, the proper assessment never occurred, and no appropriate treatment plan was put into place; LAUREL required admission into a hospital or similar facility, so her severe dehydration could be treated with intravenous fluids (IV), so she could be placed on a bed, upright, and so that she would be closely and appropriately monitored.

108.     LAUREL died because, as a result of deliberate indifference on the part of the Defendants, including the individually named Defendants and the to-be-identified COUNTY, WELLPATH, and CFMG DOE Defendants, which put LAUREL at substantial risk of suffering serious harm, she was severely dehydrated and aspirated – in other words, she inhaled gastric material (intestinal contents). When LAUREL aspirated, her air passages became blocked by intestinal material, which impeded her ability to move air in and out of her lungs and exchange carbon dioxide for oxygen, as would otherwise, normally occur.

109.     Her severe dehydration at the time of her death, which the WELLPATH (including CFMG) Defendants failed to properly assess and treat, made the occurrence of a dangerous cardiac arrhythmia much more likely.

110.     Defendants subjected ELIZABETH ANN LAUREL to their wrongful conduct, depriving ELIZABETH ANN LAUREL of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of ELIZABETH ANN LAUREL and others would be violated by their acts and/or omissions.

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

111.    As a direct and proximate result of Defendants' acts and/or omissions as set forth above, ELIZABETH ANN LAUREL, through Plaintiffs, sustained injuries and damages, as set forth above, at ¶ 104.

112.    The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and California law. Plaintiffs do not seek punitive damages directly against Defendant COUNTY.

113.    Plaintiffs are also entitled to reasonable costs and attorneys' fees, under 42 U.S.C. § 1988, and other applicable California codes and laws.

## SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 1st and 14th Am Amendments—Interference with Familial Association)
### PLAINTIFFS AGAINST DEFENDANTS TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, and DOES 1-30

114.    Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

115.    By the actions and omissions described above, Defendants, including the individually named Defendants and the to-be-identified COUNTY, WELLPATH, and CFMG DOE Defendants, deprived ELIZABETH ANN LAUREL and Plaintiffs of the following clearly established and well-settled constitutional rights that are protected by the First and Fourteenth Amendments to the U.S. Constitution:

a.    The right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship, society, and support.

116.    Defendants, including the individually named Defendants and the to-be-identified COUNTY, WELLPATH, and CFMG DOE Defendants, subjected ELIZABETH ANN LAUREL and Plaintiffs to their wrongful conduct, depriving ELIZABETH ANN LAUREL and Plaintiffs of the rights described herein, and they did so knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of Decedent or Plaintiffs would be violated by their acts and/or omissions.

117.    As a direct and proximate result of Defendants' acts and/or omissions as set forth

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

above, Plaintiffs sustained injuries and damages, as set forth in ¶ 104, above.

118.    The conduct of Defendants entitles Plaintiffs to punitive damages and penalties allowable under 42 U.S.C. § 1983 and California law. Plaintiffs do not seek punitive damages directly against Defendant COUNTY.

119.    Plaintiffs are also entitled to reasonable costs and attorneys' fees, under 42 U.S.C. § 1988, and other applicable California codes and laws.

## THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 - *Monell* Liability)
### PLAINTIFFS AGAINST DEFENDANTS COUNTY, WELLPATH, and CFMG

120.    Plaintiffs reallege each and every paragraph in this Complaint, as though fully set forth here.

121.    The unconstitutional actions and/or omissions of the individual Defendants, as well as other employees or officers employed by or acting on behalf of the Defendants COUNTY and/or WELLPATH and/or CFMG, on information and belief, were pursuant to the following customs, policies, practices, and/or procedures of Defendants COUNTY and/or WELLPATH and/or CFMG, stated in the alternative, which were directed, encouraged, allowed, and/or ratified by policymaking officials for Defendant COUNTY and/or Defendant WELLPATH and/or Defendant CFMG:

a.    To deny inmates access to timely, appropriate, competent, and necessary care for serious medical needs, requiring such inmates in crisis to remain untreated in jail, instead of providing for their urgent, emergency medical needs;

b.    To allow and encourage inadequate and incompetent medical care for inmates;

c.    To contract for obviously inadequate medical care for inmates, including creating financial incentives for WELLPATH staff not to send inmates with emergency medical needs to a hospital;

d.    To allow, encourage, and require unlicensed, incompetent, inadequately trained, and/or inadequately supervised staff to assess inmates' medical condition(s), needs, and treatment, including, but not limited to, staffing its jail with unqualified "gatekeepers" that

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

have been unconstitutionally empowered and who are unqualified to do so, to decide whether or not to provide inmates with necessary care and hospitalization;

e.      To fail to institute, require, and enforce proper and adequate training, supervision, policies, and procedures concerning persons in a medical crisis;

f.      To fail to have individual treatment plans for inmates with serious mental-health needs;

g.      To fail to have proper security checks on inmates, instead of security checks that are untimely and cursory;

h.      To cover up violations of constitutional rights by any or all of the following:

i.      By failing to properly investigate and/or evaluate incidents of violations of rights, including by unconstitutional medical care at the Santa Rita Jail;

ii.      By ignoring and/or failing to properly and adequately investigate and/or investigate and discipline unconstitutional or unlawful conduct COUNTY and WELLPATH employees; and

iii.      By allowing, tolerating, and/or encouraging COUNTY and WELLPATH staff to: fail to file complete and accurate reports; file false reports; make false statements; and/or obstruct or interfere with investigations of unconstitutional or unlawful conduct by withholding and/or concealing material information;

i.      To allow, tolerate, and/or encourage a "code of silence" among law-enforcement officers, sheriff's office personnel, and WELLPATH (including CFMG) staff at the jail, whereby an officer, member of the sheriff's office, or WELLPATH employee does not provide adverse information against a fellow officer, member of the ACSO, or WELLPATH staff;

j.      To fail to have and enforce necessary, appropriate, and lawful policies, procedures, and training programs to prevent or correct the unconstitutional conduct, customs, and procedures described in this Complaint and in subparagraphs (a) through (i) above, with deliberate indifference to the rights and safety of Decedent LAUREL, of Plaintiffs, and of

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

the public, and in the face of an obvious need for such policies, procedures, and training programs.

122.    Defendants COUNTY and WELLPATH, through their employees and agents, and through their policy-making supervisors, failed to properly hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline Defendants TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, DOES 1-30, and other COUNTY, WELLPATH, and CFMG personnel, with deliberate indifference to Plaintiffs', ELIZABETH ANN LAUREL's, and others' constitutional rights, which were thereby violated, as described above.

123.    The unconstitutional actions and/or omissions of Defendants TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, DOES 1-30, and other COUNTY, WELLPATH, and CFMG personnel, as described above, were approved, tolerated, and/or ratified by policymaking officials for the COUNTY and WELLPATH. Plaintiff is informed and believes, and thereon alleges, that the details of this incident—and all the Santa Rita Jail in-custody deaths preceding it—have been revealed to the authorized policymakers within the COUNTY, WELLPATH, and CFMG, and that such policymakers have direct knowledge of the fact that the death of ELIZABETH ANN LAUREL, as well as all of the other deaths at Santa Rita Jail preceding this tragic death, were the result of deliberate indifference to her and others' serious medical needs. Notwithstanding this knowledge, the authorized policymakers within the COUNTY, WELLPATH, and CFMG have approved of the conduct and decisions of these individual Defendants and DOES 1-30 in this matter, and have made a deliberate choice to endorse such conduct and decisions, and the basis for them, which resulted in the death of ELIZABETH ANN LAUREL.  By so doing, the authorized policymakers within the COUNTY, WELLPATH, and CFMG have shown affirmative agreement with the individual Defendants' actions and have ratified the unconstitutional acts of the individual Defendants.  Furthermore, Plaintiff is informed and believes, and thereupon alleges, that policy-making officials for the COUNTY, WELLPATH, and CFMG were and are aware of a pattern of misconduct and injury caused by COUNTY, WELLPATH, and CFMG employees that is similar to the conduct of Defendants described herein,

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

but failed to discipline culpable employees, and failed to institute new procedures and policies within the COUNTY, WELLPATH, and CFMG.

124.    The aforementioned customs, policies, practices, and procedures; the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate, and discipline; and the unconstitutional orders, approvals, ratification, and toleration of wrongful conduct of Defendants COUNTY and WELLPATH were a moving force and/or a proximate cause of the deprivations of Plaintiffs' clearly established and well-settled constitutional rights, in violation of 42 U.S.C. § 1983, as more fully set forth above, at ¶ 104.

125.    Defendants subjected Plaintiffs to their wrongful conduct, depriving ELIZABETH ANN LAUREL and Plaintiffs of the rights described herein, knowingly, maliciously, and with conscious and reckless disregard for whether the rights and safety of ELIZABETH ANN LAUREL, Plaintiffs, and others would be violated by their acts and/or omissions.

126.    As a direct and proximate result of the unconstitutional actions, omissions, customs policies, practices, and procedures of Defendants COUNTY, WELLPATH, and CFMG, as described above, ELIZABETH ANN LAUREL suffered constitutional violations, pre-death pain and suffering, serious injuries, and death, and Plaintiffs suffered their own, personal First and Fourteenth Amendment violations and are entitled to damages, penalties, costs, and attorneys' fees against Defendants COUNTY, WELLPATH, and CFMG, as set forth above, in ¶ 104, including punitive damages against Defendants WELLPATH and CFMG.

**FOURTH CAUSE OF ACTION**
**(Violation of Civil Code § 52.1 – Bane Act)**
**PLAINTIFFS AGAINST DEFENDANTS COUNTY, WELLPATH, CFMG, TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, and DOES 1-30**

127.    Plaintiffs reallege each and every paragraph in this complaint, as though fully set forth here.

128.    Plaintiffs bring the claims in this cause of action as survival claims under California law, including California Code of Civil Procedure. §§ 377.20 *et. seq.*

129.    By their acts, omissions, customs, and policies, each Defendant acting in

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

concert/conspiracy, as described above, while ELIZABETH ANN LAUREL was in custody, and by threat, intimidation, and/or coercion, interfered with, and/or attempted to interfere with, and thereby violated Plaintiffs' rights under California Civil Code § 52.1 and under the United States Constitution and California Constitution as follows:

    a.    The right to be free from objectively unreasonable treatment and deliberate indifference to ELIZABETH ANN LAUREL's serious medical needs while incustody as a pretrial detainee, as secured by the Fourteenth Amendment to the United States Constitution and by Article 1, § 7 of the California Constitution, as well as other provisions of the California Constitution;

    b.    The right to be free from wrongful government interference with familial relationships, and Plaintiffs' right to companionship, society, and support, under both the United States Constitution and the California Constitution;

    c.    The right to be protected while in custody, as secured by the Fourteenth Amendment;

    d.    The right to enjoy and defend life and liberty; acquire, possess, and protect property; and pursue and obtain safety, happiness, and privacy, as secured by the California Constitution, Article 1, § 1; and

    e.    The right to protection from bodily restraint, harm, or personal insult, assecured by California Civil Code § 43.

130.    Defendants' violations of Decedent's due process rights with deliberate indifference, in and of themselves, constitute violations of and, thus, can form the basis for a claim under the Bane Act.[36] Alternatively, separate from, and above and beyond, Defendants' attempted interference, interference with, and violations as described above, Defendants violated the Bane Act by the following conduct constituting threat, intimidation, or coercion:

---

[36] *See Atayde v. Napa State Hosp.*, No. 1:16-CV-00398-DAD-SAB, 2016 WL 4943959, at *8 (E.D. Cal. Sept. 16, 2016) (citing *M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 899 (N.D. Cal. 2013); *Scalia v. Cty. of Kern*, No. 1:17-cv-01097-LJO-SKO, 308 F. Supp. 3d 1064 (E.D. Cal. 2018); *Scalia v. Cnty. of Kern*, 493 F. Supp. 3d 890, 904 (E.D. Cal. 2019).

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

a.    With deliberate indifference to Decedent's serious medical needs, suffering, and risk of harm, including death, depriving Decedent of necessary, life-saving care for her medical needs;

b.    Subjecting Decedent to ongoing violations of her rights to prompt care for her serious medical, causing immense and needless suffering, intimidation, coercion, and threats to her life and well-being; and/or,

c.    Failed to protect Decedent, which put LAUREL at substantial risk of suffering serious harm.

131.    The threat, intimidation, and coercion described herein were not necessary or inherent in Defendants' violation of Decedent's rights, or to any legitimate and lawful jail or law enforcement activity.

132.    All of Defendants' violations of duties and rights and coercive conduct, as described herein were volitional acts; none were accidental or merely negligent.

133.    Each Defendant committed their violations with the specific intent and purpose within the meaning of the Bane Act, by acting with a reckless disregard for the Decedent's and Plaintiffs' rights, and of the interests protected by those rights.

134.    Defendants COUNTY and WELLPATH are vicariously liable for the violations of rights by their employees and agents.

135.    As a direct and proximate result of Defendants' violation of California Civil Code § 52.1, Plaintiffs sustained injuries and damages, and against each and every Defendant are entitled to relief, as set forth above, at ¶ 104, including punitive damages against all individual Defendants, WELLPATH, and CFMG, and all damages allowed by California Civil Code §§ 52, 52.1, and California law, including, but not limited to, costs attorneys' fees, three times actual damages, and civil penalties.

///

///

///

45

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

## SIXTH CAUSE OF ACTION
### (Negligence—Wrongful Death and Survival Claim)
### PLAINTIFFS AGAINST DEFENDANTS COUNTY OF ALAMEDA, WELLPATH, CFMG, TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, and DOES 1-30

136.    Plaintiffs reallege each and every paragraph in this complaint as if fully set forth here.

137.    At all times, Defendants COUNTY, WELLPATH, CFMG, TRAINA, HAILE, MOORE, SALEH, KARIM, BROWN, and DOES 1-30 owed Plaintiffs and Decedent the duty to act with due care in the execution and enforcement of any right, law, or legal obligation.

138.    At all times, these Defendants owed Plaintiffs and Decedent the duty to act with reasonable care.

139.    These general duties of reasonable care and due care owed to Plaintiffs and Decedent by these Defendants include, but are not limited to, the following specific obligations:

a.    To refrain from unreasonably creating danger or increasing Decedent's risk of harm;

b.    To use generally accepted law-enforcement procedures and tactics that are reasonable and appropriate to monitor Decedent, a mentally person in medical crisis with serious medical needs, to protect her from harm;

c.    To adhere to the standard of care, including adhering to generally accepted medical practices that are reasonable and appropriate under the circumstances;

d.    To refrain from abusing their authority granted them by law; and,

e.    To refrain from violating Decedent's rights as guaranteed by the United States and California Constitutions, as set forth above, and as otherwise protected by law.

140.    Defendants, through their acts and omissions, breached each and every one of the aforementioned duties owed to Decedent.

141.    Defendant COUNTY is vicariously liable for the violations of state law and conduct of their officers, deputies, employees, and agents, including individual named defendants, under California Government Code section 815.2.

142.    Defendant WELLPATH is vicariously liable for the tortious conduct of its

46

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL

employees and Defendant CFMG is vicariously liable for the tortious conduct of its employees.

143.    As a direct and proximate result of these Defendants' negligence, Plaintiffs and Decedent sustained injuries and damages, and against each and every Defendant named in this cause of action are entitled to relief as set forth above, at ¶ 104, including punitive damages against the individual Defendants, WELLPATH, and CFMG. Punitive damages are not sought against the COUNTY.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief against each and every Defendant herein, jointly and severally:

1. Compensatory damages in an amount according to proof and which is fair, just, and reasonable;

2. Punitive damages against the individual Defendants, under 42 U.S.C. § 1983 and California law, in an amount according to proof and which is fair, just, and reasonable (punitive damages are not sought against Defendant COUNTY);

3. Attorneys' fees and costs of suit under 42 U.S.C. § 1988;

4. Attorneys' fees and costs of suit under California Civil Code §§ 52 (b)(3) and 52.1(h);

5. All other damages, penalties, costs, interest, and attorneys' fees as allowed by 42 U.S.C. §§ 1983 and 1988, California Code of Civil Procedure § 1021.5, California Civil Code §§ 52 et seq. and 52.1, and as otherwise may be allowed by California and/or federal law; and,

6. For such other and further relief, according to proof, as this Court may deem appropriate, just, or proper.

## JURY TRIAL DEMAND

Plaintiffs hereby respectfully demand a jury trial, pursuant to Federal Rule of Civil Procedure 38, for all claims and issues that are triable by a jury.

Dated: March 31, 2025

**LAW OFFICE OF SANJAY S. SCHMIDT**
-and-
**GRACE JUN, ATTORNEY AT LAW**

*/s/ Sanjay S. Schmidt*
By: Sanjay S. Schmidt
Attorneys for Plaintiffs

47

FIRST AMENDED COMPLAINT FOR DAMAGES & DEMAND FOR JURY TRIAL
*Elizabeth Ann Laurel, et al. v. County of Alameda, et al.*
Case No. 3:24-cv-04427-RFL