UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH ANN LAUREL, et al., <br><br> Plaintiffs, <br><br> v. <br><br> COUNTY OF ALAMEDA, et al., <br><br> Defendants. | Case No. 24-cv-04427-RFL <br><br> **ORDER DENYING MOTION TO DISMISS** <br><br> Re: Dkt. No. 54 |

## I. INTRODUCTION

Minor Plaintiffs A.L. and R.R. bring a 1983 wrongful-death, and survival action related to the in-custody death of their mother, Elizabeth Laurel, in the Santa Rita Jail.  (Dkt. No. 53 ("FAC" or "Complaint").)  The Complaint alleges that Laurel died of acute polydrug toxicity approximately two days after being booked into Santa Rita.  As relevant to this order, Plaintiffs allege that various unidentified Alameda County Sheriff's Office ("ACSO") deputies failed to conduct adequately, timely visual safety checks of Laurel and failed to transfer her to a location where she could be properly monitored as she experienced drug and alcohol withdrawal, and her condition deteriorated.  Plaintiffs allege that Defendant County of Alameda (the "County") had longstanding practices of failing to train its deputies at Santa Rita to identify and respond to acute intoxication or withdrawal, failing to conduct adequate safety checks on detainees or transfer them to a location where they could be adequately monitored, and failing to supervise its for-profit correctional healthcare providers.  Plaintiffs allege that the ACSO deputies and the County's actions and inaction caused Laurel's death on February 13, 2023.

The County moves to dismiss the FAC under Rule 12(b)(6) for failure to state a claim.  (Dkt. No. 54.)  The motion is **DENIED**.  Plaintiffs have adequately alleged each of their claims

1

against the County.

## II. PLAINTIFFS' ALLEGATIONS

The First Amended Complaint alleges as follows: Decedent Elizabeth Laurel was arrested for possession of fentanyl and methamphetamine, and was booked into Santa Rita in the afternoon of February 11, 2023. (FAC ¶ 26.) Laurel was under the influence of drugs and alcohol during intake, and advised the ACSO classification officer that she was homeless and withdrawing from "heroin, fentanyl, benzodiazepines, and alcohol," and needed medical attention for withdrawal. (*Id.* ¶¶ 27, 29–30.) Laural received a medical referral form indicating "signs of acute withdrawal (kicking)." (*Id.* ¶ 27.) That evening, Wellpath medical staff screened Laurel and noted that she had a long history of regular drug and alcohol use; her urinalysis results were positive for "fentanyl, methamphetamine, amphetamine, and ecstasy/MDMA;" she had an altered mental state; and she presented various risk factors related to withdrawal and other health complications. (*Id.* ¶¶ 33–37.) Wellpath employees than recommended Laurel be placed in general population rather than the jail infirmary or a sobering cell. (*Id.* ¶¶ 37, 40.) ACSO deputies placed Laurel in general population. (*Id.* ¶ 41.) She was not prescribed any medications for treatment of opioid use disorder or opioid withdrawal, such as buprenorphine or methadone. (*Id.* ¶¶ 38–39.)

Beginning at 10:57 p.m. on February 11, 2023, Wellpath employees began performing screenings that provide a numerical score to reflect the severity of withdrawal from opioids ("COWS") and alcohol ("CIWA-Ar") that Laurel was experiencing. (*Id.* ¶ 42.) Laurel's first COWS and CIWA-Ar scores were both 6. (*Id.*) Records indicate that at 6:06 a.m. on February 12, 2023, Laurel received another COWS and CIWA-Ar assessment, but the scores were left blank. (*Id.* ¶ 43.) Approximately four hours later, Laurel received a score of 5 and 1, respectively, but the scores were inconsistent with her recorded symptoms of "chills and stomach pain with the urge to vomit[.]" (*Id.* ¶ 44.) At 7:09 p.m. on February 12, 2023, Laurel's scores were again left blank, and the assessment notes indicated that Laurel refused vital signs. (*Id.* ¶ 45.)

At 3:14 a.m. on February 13, 2023, a Wellpath employee assessed Laurel again. (*Id.* ¶ 46.) The assessment notes indicate that Laurel was seen earlier than her scheduled time due to "mandown for n/v (nausea/vomiting)", meaning that an ACSO deputy had called for medical assistance because Laurel was on the floor in distress. (*Id.*) Laurel reported chills and stomach cramps, and "had vomited 5 times in the last 24 hours with the last bout of vomiting occurring in the past 10 minutes." (*Id.*) Laurel was given a score of 7 and 3 on the COWS and CIWA-Ar. (*Id.*) At 9:44 a.m. that same day, Laurel was observed by a Wellpath employee to have a fever, elevated respiration, visible gooseflesh, and was actively vomiting, and was given a score of 11 and 10. (*Id.* ¶ 48.) Plaintiffs allege that during this time, Laurel did not receive any anti-nausea medication or IV fluids, noting contradictions between the medical notes and medication orders. (*Id.* ¶ 47.) Laurel was allegedly seen again at 4:12 p.m., but no assessment or documentation was completed. (*Id.* ¶ 62.)

At 7:02 p.m. on February 13, 2023, approximately 48 hours after she was booked into Santa Rita, ACSO deputies called for emergency medical assistance because they had found Laurel cold to touch with fixed, dilated, nonreactive pupils and no pulse. (*Id.* ¶¶ 52–53.) ACSO deputies performed chest compressions but did not regain a pulse, and Laurel was declared dead at 7:42 p.m. (*Id.* ¶ 52.) Plaintiffs allege that Laurel's autopsy report showed that prior to her death she "vomited severely for a prolonged period, causing her to inhale her stomach contents" and was "severely dehydrated" at the time of death. (*Id.* ¶ 49.) Her death was attributed to "acute polydrug toxicity (fentanyl, methamphetamine)." (*Id.* ¶ 55.)

Less than two hours before being found unresponsive at 7:02 p.m., medical notes indicate that Laurel received an assessment from a Wellpath employee, at 5:20 p.m. (*Id.* ¶ 54.) The notes state that Laurel refused monitoring check, and contain no information about Laurel's symptoms or physical state. (*Id.*) The notes were allegedly entered at 1:00 a.m. on February 14, 2023, nearly six hours after Laurel's death. (*Id.*)

The FAC alleges that Santa Rita has a long history of in-custody deaths similar to Laurel's. Plaintiffs allege that between 2014 and 2021, at least 11 individuals died of

intoxication or withdrawal-related complications. (*Id.* ¶ 78.)[1] Many were allegedly found unresponsive in their cells. (*See*, *e.g.*, *id.* ¶ 78 a–b, e, q.) Many were also allegedly exhibiting symptoms of severe intoxication or withdrawal prior to dying, such as excessive vomiting, seizing, and shortness of breath. (*See*, *e.g.*, *id* ¶ 78 b, e, f, g, m, q.) Plaintiffs also allege two instances where ACSO employees allegedly falsified documentation of safety checks to cover up their failure to properly monitor detainees with drug-related risk factors. On April 2, 2021, Vinetta Martin died by suicide in Santa Rita. (*Id.* ¶ 78 *o*.) Plaintiffs allege that "a logbook . . . indicated that a deputy had been conducting 30-minute safety checks," but "video footage showed that the deputy had not made those checks." (*Id.*) In November 2024, three ACSO deputies were allegedly charged with a felony count for falsifying records of safety checks that they did not perform on Maurice Monk. (*Id.* ¶ 78 q.) Monk was allegedly dead in his cell for three days before being discovered. (*Id.*)

Plaintiffs allege that there has been significant news coverage of the high death rate at Santa Rita. (*Id.* ¶¶ 72–74, 80.) Plaintiffs also cite a 2021 grand jury report on the conditions at Santa Rita.[2] The report found that ACSO's oversight of Wellpath's operational activities "is insufficient to ensure that health care is being delivered in a timely manner with high quality," and recommended regular auditing of the timeliness and quality of health care delivery. 2021 Grand Jury Report at 105, 108. Plaintiffs also cite a 2021 report by the Department of Justice that found "reasonable cause to believe" inadequate mental health care at Santa Rita created a risk of serious harm and that the County and the ACSO "engage in a pattern or practice of constitutional violations in the conditions at the Santa Rita Jail." 2021 DOJ Report at 1–2.[3]

---

[1] This number is exclusive of an additional six individuals with a history of drug use or drug-related symptoms who are alleged to have died by suicide during the same time period, and five individuals for whom drug use or drug-related symptoms is alleged to have been a contributing factor in their death. (FAC ¶ 78.)

[2] https://grandjury.wpengine.com/wp-content/uploads/2022/12/Grand.Jury_.Report.2022.for_.ITD_.Web_.pdf, ("2021 Grand Jury Report").

[3] https://web.archive.org/web/20250714004314/https://www.justice.gov/crt/case-

### III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). *See* Fed. R. Civ. P. 12(b)(6). To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (quoting *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014)). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the Defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556).

### IV. ANALYSIS

#### A. Section 1983 Claims Against Unidentified ACSO Deputies

Plaintiffs allege that yet-to-be identified ACSO deputies acted with deliberate indifference when they ignored Laurel's right to medical care and to be protected while in custody. (FAC ¶¶ 106, 108.) Specifically, the FAC alleges that ACSO deputies were aware of Laurel's acute medical needs and deteriorating condition, but housed Laurel in general

---

document/file/1388891/dl?inline=, ("2021 DOJ Report").

population—where she did not receive appropriate medical monitoring and treatment—and failed to provide regular and sufficient visual safety checks despite an official policy requiring safety checks every thirty minutes. (*Id.* ¶¶ 67, 69, 89.) The County argues that Plaintiffs claims are deficient because the FAC does not adequately identify the specific deputies who committed the alleged violations, and because any ACSO deputy would be entitled to qualified immunity.

### 1.     Doe Defendants Will No Be Dismissed

As a threshold matter, Plaintiffs may sue ACSO deputies without knowing their identities prior to filing the complaint, "unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (quoting *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)). The allegations in the Complaint are specific enough to provide the County "with fair notice of who Plaintiff[s] allege[] to have been involved and why their conduct was unlawful." *See Hernandez v. San Bernardino Cnty.*, No. 22-cv-1101, 2023 WL 3432205, at *5 (C.D. Cal. Apr. 13, 2023) (declining to dismiss Doe defendants because "[i]t should not be hard for Defendant to find out the names of the deputies assigned to Plaintiff's housing pod on the day of the [incident], or the names of their supervisors"). As discussed below, as currently alleged, the Complaint states claims against the ASCO deputies responsible for placing Laurel in general population on February 11, 2023, and the ASCO deputies responsible for conducting safety checks on Laurel and/or determining whether she should be transferred out of general population on February 13, 2023. (*See* FAC ¶¶ 41, 51, 108, 116.) The County does not argue that "discovery would not uncover the identities" of these ASCO deputies. *See Wakefield*, 177 F.3d at 1163. Therefore, the claims based on the conduct of Doe Defendants will not be dismissed at this time. *Id.* at 1165 (reversing dismissal where plaintiff had adequately alleged that a doe defendant exhibited deliberate indifference to his serious medical needs).

### 2.     Qualified Immunity Does Not Bar the Claims

In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the

alleged misconduct. *See Saucier v. Katz*, 533 U.S. 194, 200–01 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). "While the constitutional violation prong concerns the reasonableness of the officer's mistake of fact, the clearly established prong concerns the reasonableness of the officer's mistake of law." *Torres v. City of Madera*, 648 F.3d 1119, 1127 (9th Cir. 2011). If the answer to either is "no," then the state actor cannot be held liable for damages. *See Pearson*, 555 U.S. at 236. When qualified immunity is raised in a motion to dismiss, a court must determine "whether the facts alleged in the complaint, assumed to be true, yield the conclusion that the defendant is entitled to immunity." *Butler v. San Diego District Attorney's Office*, 370 F.3d 956, 962–63 (9th Cir. 2004). As pled, Plaintiffs have alleged sufficient facts to avoid a qualified immunity bar of their claims at this stage.

***Failure to Protect Claim.*** Plaintiffs have adequately alleged a violation of Laurel's constitutional rights to protection.[4] The elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016); *see also Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (same test applies to a medical care claim). The third element is an objective standard "akin to reckless disregard." *Castro*, 833 F.3d at 1071.

As to the first element, Plaintiffs allege that the yet-to-be identified ACSO deputies made

---

[4] "The Supreme Court has treated medical care claims substantially the same as other conditions of confinement violations including failure-to-protect claims." *See Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124 (9th Cir. 2018).

7

at least two intentional decisions:  (i) to place, and to maintain, Laurel in general population, and (ii) to provide inadequate visual safety checks with insufficient frequency.  While Plaintiffs do not yet know specific facts regarding the frequency and form of the safety checks, the allegations regarding the condition in which Laurel was found—cold to the touch, with dilated pupils, no pulse, severely dehydrated, and with aspirated vomit in her lungs—are sufficient, at this stage, to raise the inference that the safety checks and level of monitoring of Laurel were inadequate.

Moving to the second element of the claim, Plaintiffs plausibly allege that the risk of harm stemming from these intentional decisions was high.  Keeping Laurel in a bunk in general population and failing to complete timely visual safety checks meant that if Laurel experienced a medical emergency, there was likely to be a significant delay before she received medical attention.  As to the third element, Plaintiffs allege that reasonable ways to abate the risk existed, including conducting timely and sufficient safety checks, or placing Laurel in a sobering cell or in the infirmary where she would be better monitored and could receive treatment if needed.  Plaintiffs also allege that the consequences of failing to abate the risk would have been obvious to a reasonable deputy.  Plaintiffs allege that the on duty ACSO deputies on February 13, 2023, knew that Laurel was in withdrawal based on the intake notes, and that they responded to at least one "man down" medical emergency related to Laurel.  Plaintiffs also allege that as Laurel's condition deteriorated on February 13, 2023, she was vomiting constantly, was aspirating vomit, and would have been showing signs of severe dehydration.  Taken together, these allegations are sufficient to plausibly plead that the consequences of failing to abate the risk would have been obvious to a reasonable ACSO deputy.

Finally, causation is adequately alleged.  In a Section 1983 action, causation requires that the defendant's conduct be both the proximate cause and the "but for" cause of the injury. *See Chaudhry v. Aragon*, 68 F.4th 1161, 1170 n.11 (9th Cir. 2023).  While the County argues that Wellpath was responsible for Laurel's medical care, Plaintiffs allege that the ACSO deputies were responsible for placing detainees in general population—even if it was on Wellpath's recommendation—and are responsible for conducting frequent safety checks and alerting

Wellpath of medical emergencies. That is sufficient to plausibly allege that Laurel's in-custody death was both the foreseeable result of the ACSO deputies' failures and that her death would not have happened "but for" those failures.

*Familial Association Claim.* Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct. *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Official conduct that "shocks the conscience" in depriving parents or children of that interest is cognizable as a violation of due process. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). Just as the deliberate indifference of prison officials to the medical needs of prisoners may support Fourteenth Amendment liability, such indifference may also "rise to the conscience-shocking level" required for a substantive due process violation. *C'nty. of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998). Recklessly indifferent conduct will meet the "shock the conscience" standard where the individual had time to deliberate before acting or failing to act in a deliberately indifferent manner. *See Tennison v. City and C'nty. of San Francisco*, 570 F.3d 1078, 1089 (9th Cir. 2009). For the reasons described above, Plaintiffs have adequately alleged official conduct that "shocks the conscience" based on the alleged deliberate disregard for Laurel's escalating medical crisis, and deliberate failure to abate the risk of harm over a significant period of time. *See Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013).[5]

### 3. Clearly Established Right

The Ninth Circuit has held that "pre-trial detainees have a right to direct-view safety checks sufficient to determine whether their presentation indicates the need for medical treatment." *Gordon v. County of Orange*, 6 F.4th 961, 973 (9th Cir. 2021); *see also Estate of Abdollahi v. C'nty of Sacramento*, 405 F. Supp. 2d 1194, 1206–07 (E.D. Cal. 2005) (denying a

---

[5] Plaintiffs also assert that this claim could alternatively be based on the First Amendment. Because Plaintiffs have stated a viable familial association claim based on the Fourteenth Amendment, this order does not reach this alternative theory.

county's summary judgment motion where a reasonable jury could find the jail's policy of placing detoxing detainees in general population and failing to provide regular safety checks posed a substantial risk to inmates). In *Gordon*, deputies failed to follow police department protocol, which required at least hourly, direct visual observation of all detainees. *Id.* at 966–67. Instead, they had conducted safety checks from a corridor six feet above and 12–15 feet away from Gordon's bunk. *Id.* at 967. One deputy admitted that, from his vantage point, "he was unable to ascertain whether Gordon was . . . alive." *Id.* By the time other detainees gave a "man down" alert, Gordon was unresponsive and cold to the touch. *Id.* In *Gordon*, the Ninth Circuit did not reach whether the safety checks were adequate, because the right it found had not previously been clearly established. *Id.* 973. However, it cautioned "prison personnel [to] heed this warning because the recognition of this constitutional right will protect future detainees." *Id.*

*Gordon* predates Laurel's death by more than two years, and the County does not distinguish the right that was found in *Gordon* from the allegations in this case. Therefore, Plaintiffs have adequately pled that by failing to transfer Laurel to a location where she could be adequately monitored or provide her with timely and sufficient direct-view safety checks, ACSO deputies violated a clearly established right.

### B. Monell Claim Against the County

"To impose Monell liability on a municipality under Section 1983, [P]laintiff[s] must prove: (1) [Laurel] had a constitutional right of which [s]he was deprived; (2) the municipality had a policy; (3) the policy amounts to deliberate indifference to [her] constitutional right; and (4) 'the policy is the moving force behind the constitutional violation.'" *Gordon*, 6 F.4th at 973 (quoting *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011)). A governmental policy is "a deliberate choice to follow a course of action . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). The policy requirement can be satisfied by showing a "longstanding practice or custom." *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014). Such circumstances may arise when, for instance, the public entity "fail[s]

to implement procedural safeguards to prevent constitutional violations," and the failure amounts to deliberate indifference. *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1143 (9th Cir. 2012) (citing *Oviatt v. Pearce*, 954 F.2d 1470, 1477 (9th Cir. 1992); *see also City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (setting out a similar standard for failure to train claims). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

As discussed above, Plaintiffs adequately allege that Laurel's constitutional rights were violated, satisfying the first prong of the *Monell* liability analysis. Second, Plaintiffs adequately allege longstanding practices or customs, including:

- Failure to train staff to identify and respond to acute intoxication or withdrawal. (FAC ¶¶ 82, 88, 121 a, d, e.)
- Failure to provide constitutionally adequate safety checks or transfer high-risk individuals to a sufficiently monitored location. (*Id.* ¶¶ 70, 78, 83–85, 89–90, 121 a, g.)
- Failure to supervise the for-profit correctional healthcare providers' delivery of medical care at Santa Rita. (FAC ¶¶ 84, 87, 121 b, c, h.)

The longstanding nature of the alleged practices are supported by Plaintiffs' allegations that Santa Rita has a long history of in-custody deaths similar to Laurel's, including many individuals were allegedly exhibiting symptoms of severe intoxication or withdrawal, were found unresponsive in their cells, and subsequently were found to have died of intoxication or withdrawal-related complications. (*See*, *e.g.*, ¶ 78 a–b, e, f, g, m, q.) Plaintiffs also allege two instances where ACSO deputies allegedly falsified documentation of safety checks after an in-custody death. (*Id.* ¶ 78 *o*, q.) This pattern of highly troubling alleged incidents plausibly raises the inference of a "failure to implement procedural safeguards to prevent constitutional violations," including a failure to adequately supervise and train. *Tsao*, 698 F.3d at 1143*; see*

11

*also*, *e.g.*, *Lapachet v. California Forensic Med. Grp., Inc.*, 313 F. Supp. 3d 1183, 1193 (E.D. Cal. 2018).

The County argues that it cannot be liable for its failure to supervise Wellpath because Wellpath and its employees are not County employees. (Dkt. No. 74 at 9.) But "Alameda County, of course, cannot escape *Monell* liability by contracting out medical care for pretrial detainees—it still has a constitutional responsibility to provide 'adequate medical treatment to those in its custody.'" *Chaidez v. Alameda Cnty.*, No. 21-cv-04240-RS, 2023 WL 6466385, at *6 (N.D. Cal. Oct. 3, 2023) (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)); *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1074 (9th Cir. 2010) ("[A] State cannot avoid its obligations under federal law by contracting with a third party to perform its functions."). In *Burke v. Regalado*, the Tenth Circuit explained that because the sheriff—and by extension the county—had control over the for-profit correctional healthcare provider and had notice of a pattern of unconstitutional acts committed by the provider, municipal liability for failure to supervise could be established. 935 F.3d 960, 996 (10th Cir. 2019). District courts in the Ninth Circuit have similarly found that a municipality's custom or policy of failing to ensure health care contractor provided constitutionally adequate care to detainees can give rise to liability under *Monell*. *See, e.g., Chaidez,* 2023 WL 6466385, at *6; *Pajas v. County of Monterey*, No. 16-cv-945, 2018 WL 5819674-BLF, at *7 (N.D. Cal. Nov. 5, 2018) (finding that the county's "custom or policy of failing to monitor CFMG to ensure that CFMG provided adequate detoxification treatment to inmates" "could give rise to liability" under *Monell*).

Plaintiffs have also adequately alleged deliberate indifference. Deliberate indifference for municipal liability is an objective standard. *Castro*, 833 F.3d at 1076 (9th Cir. 2016). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *City of Canton*, 489 U.S. at 396 (O'Connor, J. concurring in relevant part). In this case, Plaintiffs have alleged sufficient facts to establish actual or constructive notice. In addition to the highly

publicized pattern of similar in-custody deaths described above, Plaintiffs have alleged that a recent Grand Jury investigation found that ACSO's oversight of Wellpath's operational activities "is insufficient to ensure that health care is being delivered in a timely manner with high quality," and recommended regular audits of the timeliness and quality of health care delivery. 2021 Grand Jury Report at 105, 108.  Plaintiffs also cite a 2021 investigation by the Department of Justice that found "reasonable cause to believe" inadequate mental health care (including substance abuse disorders services) at Santa Rita created a risk of serious harm and that the County and the ACSO "engage in a pattern or practice of constitutional violations in the conditions at the Santa Rita Jail." 2021 DOJ Report at 1–2, 27 (explaining that "[s]everal prisoners were noted to be in distress from opioid withdrawal at the time of their mental health assessments in the Jail").  Deliberate indifference has been adequately alleged.

Finally, causation has been adequately alleged for the same reasons discussed in Section IV.A.2.  Therefore, the County's motion to dismiss the *Monell* claim is denied.

### C. Bane Act

To state a claim under the Bane Act, a plaintiff must allege: "(1) intentional interference or attempted interference with a state or federal constitutional or legal right, and (2) the interference or attempted interference was by threats, intimidation or coercion." *Allen v. City of Sacramento*, 234 Cal. App. 4th 41, 67 (Ct. App. 2015).  The Bane Act does not require the "threat, intimidation[,] or coercion element of the claim to be transactionally independent from the constitutional violation alleged, but that defendant must have a "specific intent" to commit the constitutional violation. *See Reese v. County of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018) (analyzing a Bane Act claim related to an unreasonable seizure).  District courts in this Circuit have held that deliberate indifference to, or reckless disregard for, a prisoner's serious medical needs satisfies the "threat, intimidation, or coercion" and specific intent requirement of the Bane Act. *See Brownlee v. Cnty. of Los Angeles*, 12-cv-01118, 2024 WL 4404007, at *40 (C.D. Cal. June 3, 2024) (collecting cases).  The Court finds this majority position persuasive.

13

Plaintiffs have stated a claim under the Bane Act as to the ACSO deputies at issue.[6]

### D. Negligence

"California public entities, including local governments, are derivatively liable for the negligent acts or omissions of public employees within the scope of their employment." *Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012) (citing Cal. Gov't Code § 815.2(a)); *see also C.A. v. William S. Hart Union High Sch. Dist.*, 270 P.3d 699, 703–05 (Cal. 2012) (plaintiff stated a claim for vicarious liability of a district under Section 815.2 where the employees were alleged to have violated their duty of care to plaintiff). Where a plaintiff has adequately alleged that "County employees were negligent, he must also be permitted to allege that the County is derivatively liable pursuant to California Government Code § 815.2(a)." *Hernandez*, 666 F.3d at 638.

The allegations that support Plaintiffs' Section 1983 claims also plausibly support a negligence claim for which the County would be found vicariously liable under Section 815.2, and the County has not identified any specific basis for immunity. Therefore, the motion to dismiss is denied as to the negligence claim.

### V. CONCLUSION

For the reasons described above, the County's Motion to Dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 19, 2025

RITA F. LIN
United States District Judge

---

[6] The County raises for the first time on reply an argument as to whether supervisory liability exists under the Bane Act and thus whether it can be liable for the ACSO deputies' Bane Act violations. (Dkt. No. 74 at 10.) There is a split in the district courts on this issue. *See Est. of Arroyo v. C'nty. of San Diego*, No. 21-cv-01956, 2024 WL 4668146, at *21 (S.D. Cal. Nov. 4, 2024) (collecting cases). The Court declines to address this argument because it was raised only on reply and thus has not been adequately briefed. *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n. 8 (9th Cir. 2014) (arguments raised on reply are waived).